**Robert James TENNARD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69729.**

Court of Criminal Appeals of Texas,
En Banc.

Nov. 28, 1990.

Rehearing Overruled Jan. 30, 1991.

Robert A. Scardino, Jr., court appointed, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Deborah Mantooth, J. Sidney Crowley and Mike Anderson, Asst. Dist. Attys., Houston, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PER CURIAM [*].

Appellant, Robert James Tennard, was convicted of capital murder, V.T.C.A. Penal Code, § 19.03(a)(2). Thereafter, the jury made affirmative findings to the special issues required by Article 37.071(b), V.A.C.C.P. In response, the trial court assessed appellant's punishment at death. Appellant's cause is now before us on direct appeal pursuant to Articles 4.04, § 2, and Article 37.07(h), V.A.C.C.P.

Appellant presents three points of error: (1) the prosecutor improperly exercised his peremptory strikes so as to strike black veniremen; (2) a police officer made reference to a witness' taking and passing a polygraph exam; and (3) two witnesses gave unresponsive answers which implied that appellant had previously been incarcerated in the penitentiary.

The sufficiency of the evidence is not challenged; therefore, only a brief recitation of the facts is necessary. Paul Anthony Bogany testified that on the evening of August 15, 1985, he went to the Groovey Shack Lounge located in Harris County, Texas. There he met appellant and another man, Daniel Groom. Around 8:00 p.m., the three walked to the house of an alleged friend of appellant. Appellant, Bogany, and Groom drank liquor and smoked mari-

huana with the eventual victims, Larry Neblett and Chester Smith, for about half an hour. At some point, Neblett left the room, followed by appellant. Smith remained in the front room with Groom and Bogany. Shortly thereafter, as Smith was changing a record, Groom struck Smith several times with a hatchet. After Smith fell to the ground, Groom ran to the bedroom where appellant and Neblett had gone. As Groom opened the door, a bloody Neblett fell through the doorway. Appellant was seen in the bedroom clutching a knife in his hand. Appellant, Groom, and Bogany then took various pieces of property from the home of the victims and left in a car belonging to one of the victims. Later that evening, the three men arrived at the home of Fred Stewart and Ruby Montgomery. Appellant enlisted Stewart to help sell the proceeds of the robbery. Stewart testified that appellant gave him a couple of gasoline credit cards which he used to purchase gasoline. Stewart was arrested for the unauthorized use of the credit cards, and this ultimately resulted in appellant's arrest.

### I.

■ In his second point of error (which is multifarious but will nevertheless be examined), appellant contends that the trial court erred in allowing the prosecution to exercise peremptory challenges against five members of the black race. At the outset it should be noted that appellant is black. Appellant contends that the prosecutor struck these potential jurors solely on the basis of race in violation of the United States Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (hereinafter cited as "*Batson*"). In *Batson*, the Supreme Court concluded that the State's purposeful or deliberate denial of jury participation to black persons solely because of race violates a defendant's rights under the Equal Protection Clause of the United States Constitution.

The record reflects that a venire panel of fifty-six prospective jurors was questioned

---

[*] This opinion is a revision of a draft originally prepared by the late Judge Duncan.

by the court and the parties. Eighteen of these potential jurors were challenged for cause. The State exercised fifteen peremptory strikes and the defense used ten before the jury, including an alternate, was finally selected. One black was eventually sworn as a juror in this case. After the jury was chosen, but before it was sworn, appellant made a motion to strike the jury and declare a mistrial based on the *Batson* decision.

At a hearing on appellant's motion, the parties stipulated that appellant was a black man and that fifty-two veniremen had been voir dired.[1] Appellant offered into evidence copies of the Juror Information Sheets pertaining to the veniremen questioned. The State thereafter reminded the trial court that an explanation had been offered by the prosecutor following the exercise of each peremptory strike upon a black juror. The prosecutor then supplemented his previous explanations with regard to several of those jurors. There is nothing in the record to indicate exactly how many blacks were among the questioned venire.[2]

Although the State struck seven blacks peremptorily, appellant complains on appeal of the prosecutor's peremptory strikes of only five of these veniremen.[3]

In order to invoke the protections set forth in *Batson*, a defendant must establish purposeful discrimination by showing that:

(1) he is a member of a cognizable racial group;

(2) the prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race; and

(3) the facts and any other relevant circumstances raise an inference that the prosecutor used these peremptory challenges to exclude the veniremen solely on account of their race.

The proper procedure to be followed by the trial court was aptly stated in *Keeton v. State*, 724 S.W.2d 58 (Tex.Cr.App.1987):

If the defendant raises an inference of purposeful discrimination through the State's use of its peremptory strikes, and the trial court determines that a prima facie case of discrimination exists, then the burden shifts to the prosecutor who must come forward with a neutral explanation for the challenges. The trial court must then determine whether despite the State's explanation, the defendant has established purposeful discrimination. The Supreme Court in *Batson, supra*, stressed that not just any explanation would do, and in fact some explanations would per se not be sufficient. *Batson, supra*, 106 S.Ct. [at] 1722, 1723. By largely judging credibility of the prosecutor, content of the explanation and all other surrounding facts and circumstances, the trial judge must make a finding of fact concerning purposeful discrimination which should be given great deference by a reviewing court. *Batson, supra*, n. 21.

*Keeton*, 724 S.W.2d at 65. *See also Keeton v. State*, 749 S.W.2d 861, 862 (Tex.Cr. App.1988). The standard of review on appeal is the same "clearly erroneous" standard as that articulated in Fed.R.Civ.Proc. 52(a), under which the findings of the trial court will not be disturbed if they are supported by the record. *Whitsey v. State*, 796 S.W.2d 707 (Tex.Cr.App.1990) (Opinion on State's motion for rehearing).

There is no contention that the issue regarding the State's use of peremptory strikes was not timely presented to the trial court. *Henry v. State*, 729 S.W.2d

---

1. Contrary to the stipulation, the record reveals that fifty-six venirepersons were actually questioned. The discrepancy apparently arises from the inclusion of the additional screening involved in selecting the alternate juror.

2. It appears that approximately fourteen blacks were on the venire.

3. The prosecution also exercised peremptory challenges against venirepersons Deloris Turner and Judeene Edison. We note that Turner expressed an initial opposition to the death penalty and indicated that she could not assess such a penalty. Appellant was able to rehabilitate her so as to avoid a challenge for cause. Appellant did not question venireman Edison and did not object to the State's use of a peremptory strike. Edison had also expressed deep reservations concerning the death penalty.

732 (Tex.Cr.App.1987). Indeed, appellant objected following the use of a peremptory strike on each of the veniremen of which he complains. Furthermore, appellant's motion to strike the jury and declare a mistrial was presented to the trial court before the jury was sworn.

A hearing on appellant's motion to strike the jury was held immediately, during which appellant was given the opportunity to present evidence supporting his motion. The State responded after appellant raised an inference of purposeful discrimination. Following the prosecution's explanations for the exercise of its peremptory strikes, the trial judge denied appellant's motion to strike the jury. We now turn to review the trial court's determination that the prosecutor did not improperly strike prospective jurors on the basis of their race.

Analyzing the procedural and evidentiary implications of *Batson*, in *Tompkins v. State*, 774 S.W.2d 195 (Tex.Cr.App. 1987), *affd.*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989), this Court noted that "a prima facie case represents the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* at 201. Obviously, the trial judge concluded that appellant had established a prima facie case, because he held a hearing to consider the issue. At such a hearing, the burden of production shifts to the State to bring forward a neutral explanation for exercising its peremptory strikes. *Batson*, 106 S.Ct. at 1723. However, it remains the ultimate burden of the accused to persuade the trial judge by a preponderance of the evidence that the allegations of purposeful discrimination are true. *Tompkins, supra.* An appellate court must view the entire record in a light most favorable to the trial judge's determination. *Keeton*, 724 S.W.2d at 64. Reversal is required only if the trial judge's findings of fact are "clearly erroneous" in light of the entire record. *Whitsey v. State, supra.*

It is the duty of the trial judge, as a fact finder, to weigh the evidence and assess the credibility of the witnesses. The five veniremen allegedly struck by the State because of their race and the prosecution's explanations for its peremptory challenges are set out below:

(1) Henry Nichols: Trouble understanding questions; venireman indicated that a defendant's past criminal history was not relevant to a determination that he might constitute a continuing threat to society; hostility towards prosecutor; venireman was of allegedly limited intelligence;

(2) Evelyn Guillory: Venireman expressed reservations and was ambivalent about the death penalty; venireman was clinical social worker who indicated that her rehabilitative work may influence her in judging this case;

(3) JoAnn Smith: Venireman initially indicated that she was opposed to the death penalty and could not vote so as to impose the death penalty. She later stated that she could follow the law despite her opposition to the death penalty;

(4) L.V. Tummer: Venireman initially indicated that he was opposed to the death penalty and that he could never vote in such a way that it would be imposed. Yet, he later stated that he could. In addition, venireman was allegedly of low intelligence such that he simply agreed with whoever was questioning him at the moment. For that reason the prosecutor did not believe the venireman was being honest in asserting that he could assess the death penalty;

(5) James Doyle: Venireman indicated that he had problems assessing the death penalty, as well as answering special issue number two with regard to future dangerousness. The venireman also expressed reservations about relying on accomplice witness testimony. Finally, the venireman was 21 years of age and does not have life experiences necessary to handle the special issues. Moreover, the venireman, if taken, would represent the fourth juror under age 30 which the prosecutor was tactically uncomfortable with.

During questioning by the prosecutor, venireman Nichols indicated that appellant's past criminal behavior would have no bearing on determining the probability of future dangerousness. Appellant made no effort to question Nichols.[4] Moreover, the prosecution anticipated and did in fact introduce evidence concerning appellant's past criminal behavior during the punishment stage.

The prosecutor also contended that venireman Nichols and venireman Tummer were struck due to their low level of intelligence and consequent inability to deal with the complex nature of the detailed written jury instructions. The prosecutor also felt that Nichols showed hostility towards him. Obviously, it is hard to determine conclusively from a cold record whether a venireman is of little intelligence or shows hostility towards the prosecution. Consequently, we must rely on the trial court's observations of the venireman's answers and demeanor relative to such explanations.

Of the remaining four veniremen, each initially expressed opposition or reservations about the death penalty. Although such beliefs were insufficient to support a challenge for cause, surely they will support a trial court's finding of an adequate independent, non-racial justification for the prosecution's decision to peremptorily strike these veniremen. *Tompkins*, supra.

After reviewing the explanations offered by the prosecution for exercising its peremptory strikes on the five black veniremen, we conclude that the trial court did not "clearly err" in finding that appellant failed to sustain his burden of proving by a preponderance of the evidence that the prosecution's peremptory strikes were the product of purposeful discrimination. See *Tompkins, supra,* and *Whitsey, supra.*[5]

## II.

In appellant's first point of error, he contends that an unresponsive answer, provided by a police officer, revealed the existence and results of a polygraph exam administered to Fred Stewart, a previous suspect. The record shows that officer R.L. Maxey had originally arrested Stewart for using one of the victim's credit cards. Officer Maxey later arrested appellant, and was called by the State to testify regarding that arrest.

During questioning by the officer after his arrest, Stewart implicated Bogany in the offense. Bogany thereafter implicated appellant and Groom. At trial, defense counsel attempted to discredit Officer Maxey's testimony concerning his opinion of Stewart's veracity. The following transpired:

Q: [Defense counsel]: Sergeant Maxey, yesterday when we were discussing your investigation—correct me if I'm wrong—I think we had finished talking about or were talking about what you had discovered from Fred Stewart; is that not correct?

A: Yes, sir.

Q: And I think we ended up with you telling the jury that you believed Fred Stewart; is that correct?

A: Yes, sir.

---

**4.** Appellant argues in his brief that Nichols was simply restating the law. That is, that prior bad acts have little relevance with regards to a defendant's *culpability* in another case. While this is certainly true, appellant ignores the fact that the question posed was within the context of answering special issue number two on future dangerousness. In this context, past criminal behavior may be extremely relevant.

By our reading of the record, it seems likely that there was a misunderstanding between the juror and the prosecutor on this point. Nichols may well have been saying that culpability in the principal case is unaffected by the defendant's prior record. Since the prosecutor had asked the question in the context of discussing "future dangerousness," he appears to have reasonably taken Nichols' answer to be directed to the question of future dangerousness.

**5.** We note that appellant made no effort, at the hearing or in his brief, to employ a comparative analysis between black and white veniremen. That is, appellant did not request the trial court, nor does he request this Court, to compare the prosecutor's neutral explanations used to strike black veniremen with evidence that unchallenged white veniremen also possessed the same purportedly undesirable characteristics. See *Tompkins,* 774 S.W.2d at 202, n. 6A.

Q: In spite of the fact that he had possession of all of the dead men's [sic] property; is that not correct?

A: He ended up with possession of it, yes, sir.

Q: In spite of the fact that Fred Stewart has been to the pen for offenses that are related to the offense that you're investigating; is that not correct?

A: Yes, sir.

Q: Which is, he has been to the penitentiary for unauthorized use of a motor vehicle, had he not?

A: That's correct.

Q: And he's been to the pen for—and I get these confused, so correct me if I'm wrong—had he not been to the penitentiary for burglary of a habitation?

A: I have to look at his record to confirm that. I think that might be correct.

Q: And the murder that you're investigating involved an offense like burglary of a habitation, did it not, where people go into a residence where people live? Is that not burglary of a habitation with intent to commit a theft or another felony?

A: Burglaries are committed by persons that normally go into a home when no one else is there.

This is more of a robbery, where the suspects go inside, they confront the individual and do violence against them or threaten violence against them to commit their crime or to commit their theft.

Q: Sergeant Maxey, do you have evidence that you can demonstrate to this jury, besides believing Bogany and Stewart, other than that, do you have evidence that would indicate that this was anything other than a burglary, where the burglar or burglars were discovered while they were in the house?

A: There was no sign that made me think there was any burglary involved. There was no sign of forced entry, as normally there is in a burglary. To gain entry, one has to break a window or pick a door in order to gain entry. There was no signs of forced entry on the house, which made us believe that the suspects had been admitted there by the Complainants.

Q: Are not burglaries also committed by persons finding open, unlocked windows and unlocked doors?

A: Yes, sir, but with an unlocked door, it's very unusual. An unlocked window is sometimes found, but the burglar usually leaves the window up. He barely takes the time to close the window behind him.

Q: But at any rate, you believed Fred Stewart, with all his offenses and all the other involvement you had concerning Fred Stewart?

A: *Plus I gave him a polygraph test, which confirmed his story, which he passed.*

[Defense counsel]: We will object to the nonresponsive answer of the witness about the polygraph. [emphasis added]

The court sustained appellant's objection and instructed the jury to disregard the officer's answer, but denied his request for a mistrial. The State argues that the court was correct to deny a mistrial because the answer Officer Maxey gave was "invited" and, even if it was not "invited," the answer was harmless beyond a reasonable doubt.

▪ The existence and results of a polygraph examination are inadmissible for all purposes. *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985); *Peterson v. State*, 157 Tex.Cr.R. 255, 247 S.W.2d 110 (1951). When, in the course of a trial, reference to polygraph tests are made, the Court's analysis initially focuses on whether or not the results were revealed to the jury:

Where the defense insists on a mistrial, the sufficiency of an instruction to disregard polygraph evidence generally depends on whether the results of the exam were revealed to the jury. In all cases we found where an instruction to disregard was held sufficient, lie detector

evidence was only mentioned and no results were disclosed.

*Banda v. State*, 727 S.W.2d 679, 681 (Tex. App.—Austin 1987). *See also, Roper v. State*, 375 S.W.2d 454 (Tex.Cr.App.1964); *Paredes v. State*, 368 S.W.2d 620 (Tex.Cr. App.1963). In the instant case, the results of the polygraph exam were revealed to the jury.

■ Responding to part of the State's argument, we reject its position that Officer Maxey's answer was "invited." Officer Maxey was asked "whether" he believed Stewart, not "why" he believed him. Thus, the officer's answer was unresponsive to the question as asked. Consequently, the officer's revelation that Stewart had taken and passed a polygraph exam was error.

Appellant cites two cases as grounds for reversal. In *Nichols v. State*, 378 S.W.2d 335 (Tex.Cr.App.1964), the prosecutor asked the complainant whether she had taken a lie detector test. After the witness answered that she had done so, the defense objected. We held that the successful results of the examination were implied by the nature of the prosecutor's question. Moreover, the polygraph evidence in that case was actively sought by the prosecutor rather than coming in as a result of an unresponsive answer. The Court found that an instruction to disregard could not cure the harm done by the question because, without a doubt, it effectively bolstered the witness's testimony. Further, the State's entire case depended solely upon the testimony of that witness:

> In a situation where the state's whole case depended entirely upon the testimony of this one 14 year old witness whose credibility must have appeared somewhat shaken to the Assistant District Attorney and must have, he thought, be in need of bolstering, appellant should not have been placed in this intolerable position.

378 S.W.2d at 338.

*Robinson v. State*, 550 S.W.2d 54 (Tex. Cr.App.1977), is also cited by appellant. Like *Nichols, supra*, in *Robinson, supra*, the State's key witness had taken and passed a polygraph exam. This fact was admitted into evidence over defense counsel's objection. The case was subsequently reversed because the admission of the polygraph exam was deemed harmful and prejudicial to the defendant.

■ The present case is unlike either *Nichols, supra*, or *Robinson, supra*, in that in this case the witness whose polygraph results became apparent was neither the sole witness nor even a crucial witness. Officer Maxey's unresponsive answer introduced testimony about Stewart's polygraph test to reinforce the officer's own reasons for believing him. At most the mention of the polygraph exam served to lend Stewart's trial testimony more credibility. The majority of his testimony dealt with appellant's possession of the deceased's property. The State produced several other witnesses who testified to appellant's possession of the stolen merchandise, corroborating Stewart's version of events.

Under the circumstances, despite the existence of trial error in this instance, we find beyond a reasonable doubt that said error made no contribution to the verdict or to the punishment. Tex.R.App.Pro., Rule 81(b)(2).

## III.

In his final and again multifarious point of error, appellant complains of the unresponsive answers of two State's witnesses which implied that appellant had previously been "sent to" or incarcerated in the penitentiary.

■ Initially, appellant complains of the following unresponsive answer given by Fred Stewart on cross-examination by defense counsel, during the guilt-innocence phase:

Q [Defense counsel] How long have you known Robert Tennard?

A Ever since elementary, sir.

Q And you all met up again about June or July; isn't that correct?

A Of '81, sir, correct.

Q Prior to August the 15th, you started running with Tennard again about when?

A Running with him?

Q When was the first time prior to August the 15th that you saw Robert Tennard?

A *When he first got out of the penitentiary.* [Emphasis added]

Appellant's objection was sustained and at appellant's request the jury was instructed to disregard the witness' answer. However, appellant's request for a mistrial was denied.

Obviously, reference by a witness to a defendant's prior incarceration in the penitentiary is improper as it violates the long-standing general rule of evidence which prohibits the introduction of collateral offenses and transactions. See now Tex.R. Crim.Evid., Rule 404(b). However, in *Williams v. State,* 643 S.W.2d 136 (Tex.Cr. App.1983), this Court was faced with a very similar situation. There, the witness gave the following unresponsive answer to the prosecutor's question:

Q That marriage relationship [between appellant and Chambers' present wife] is it your understanding that that ended back in 1973 or approximately that time?

A Yes sir, *she got it annulled when he got sent to the penitentiary.* [emphasis added]

*Id.* at 137. The Court thereafter noted:

[O]ur research also reveals that error will not necessarily be reflected in every unresponsive answer by a State's witness which implicates a reference to the fact that a defendant has been 'sent to' or incarcerated in the penitentiary. Even where such prejudicial information is inadvertently placed before a jury, the general rule is still that an instruction by the trial judge to the jury to disregard such answer will be sufficient to cure any unresponsive answer.

*Id.* at 138. *See also, Richardson v. State,* 624 S.W.2d 912 (Tex.Cr.App.1981); *Gardner v. State,* 730 S.W.2d 675, 696–97 (Tex. Cr.App.1987).

In the present case, the trial judge promptly instructed the jury to disregard witness Stewart's answer. We hold that any error was thereby cured.

■ Appellant also complains of the unresponsive answer given by Ruby Montgomery on direct examination by the prosecutor:

Q [Prosecutor] Did you know [appellant] for some time before that or had you met [appellant] before?

A I had met him *when I got out of the penitentiary.*

Q You had met him before? Was anybody else out there with them?

A Well, I didn't see no one. [emphasis added]

After several more questions, appellant asked to approach the bench and objected to the witness' unresponsive answer. The court sustained the objection and instructed the jury to disregard "the answer that this witness gave and not consider that answer for any purpose." Appellant's motion for mistrial was denied.

Montgomery, who was living with Stewart, was called by the State. She testified that appellant, Groom and Bogany had apparently stayed at her home on the night of the killings. She also identified several pieces of property which appellant and his companions had left in her home. This property was later identified as having been the property of the two victims.

We observe: first, that appellant's objection was tardy as several other questions were interposed between the witness' answer and appellant's objection; second, the instruction to disregard requested by appellant did not specifically refer to the unresponsive answer complained of since several other answers had also been given; and third, and most significantly, the witness did not refer to a prior stay in the penitentiary by appellant. Instead, the witness commented that she met appellant only after *she* was released from the penitentiary.

Appellant submits that the witness intended to say "he" as opposed to "I" since "the record is clear that Ms. Montgomery has never been incarcerated in a penal institution." Appellant concedes, however, that the witness had been incarcerated in the county jail on several occasions. Appellant also contends that the court, prosecutor and defense counsel realized that the

witness' answer was unresponsive. By our reading, the record does not so clearly support these assertions.

With rare exceptions, we are concerned only with what was heard or seen by the jury, not with what the attorneys believe a witness meant to say. In this instance, the jury was left with an awareness that Montgomery, not appellant, had spent time in the penitentiary. Whether Montgomery appreciates the technical difference between the terms "penitentiary" and "jail" is of little consequence. The fact remains that the jury only heard that a State's witness had been in the penitentiary. Moreover, appellant's belated request for an instruction to disregard was honored. No error has been shown. Finally, appellant was not harmed by the witness' answer in any way. If anything, the credibility of the State's witness was left somewhat tarnished. This ground of error is overruled.

The judgment of the trial court is affirmed.

TEAGUE, J., dissents.

BERCHELMANN and STURNS, JJ., not participating.