Frank ALEXANDER, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–95–00113–CR.

Court of Appeals of Texas,
Texarkana.

Submitted Dec. 13, 1995.

Decided March 5, 1996.

**758**

John D. Nation, Dallas, for appellant.

Carolyn Fitz–Gerald Levin, Assistant District Attorney, Dallas, Sue Korioth, Assistant District Attorney, Dallas, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

Frank Alexander appeals from a jury conviction for the murder of Joe Patrick Robbins, for which he was sentenced to sixty years' confinement. He contends on appeal that the evidence was insufficient to sustain his murder conviction; that the trial court erred in permitting impeachment of a witness to the effect that she refused to appear to testify despite reasonable efforts by the State; that the trial court erred in denying his motion for mistrial after a juror communicated a question to the bailiff, which was then communicated to the prosecuting attorney; that the trial court erred in overruling his objections to the punishment argument by the State referring to community expectations of a life sentence; and that the trial court erred in denying his objections to the State's use of peremptory challenges against two minority venire members.

The first trial against the appellant for this offense ended in a mistrial. This is an appeal from the second trial.

Alexander was having a barbecue on the afternoon of February 1, 1992. During the afternoon and early evening, the following persons were present at Alexander's apartment: Frank Alexander; Tatiana Alexander, Alexander's daughter; Ronnie Dean, a friend of Alexander's; Joe Robbins, Alexander's next-door neighbor; Tiffany Robbins, Robbins's daughter; and Kenny Williams, another neighbor. There was some testimony that

Alexander's niece and nephew might have been present.

Tiffany Robbins testified that, in the early evening, Robbins broke Alexander's glass-topped coffee table by throwing it to the ground. Alexander then went to the closet and took out a gun. Robbins ran out of the apartment, followed by Alexander. Tiffany later heard two shots, ran out of the apartment, and saw her father lying on the ground, bleeding from his head and knees. A passenger in a car travelling along the street next to the parking lot heard a loud noise and saw a man, facing away from her, with his arm extended as if he were holding a gun. She also saw someone's legs on the ground behind the man. She could only identify the man as dark and broad-chested.

An officer arrived, found the body, and tried to stop the bleeding. No eyewitnesses, weapons, shell casings, or identifiable fingerprints were ever found by the police. Witnesses, however, heard the gunshots.

The medical examiner concluded that Robbins died from a gunshot wound to the head and that the trajectory of the bullet wound was from the left and slightly downward, and that the shot was probably fired from a distance of at least several feet. The firearms examiner concluded that the shots were probably fired from a revolver and were consistent with a .38 or .357 caliber bullet. A detective with the Dallas Police Department testified that Robbins's apartment showed no signs of burglary.

Alexander, Linda Alexander (Alexander's wife), Tatiana Alexander, and Tiffany Robbins spent the night at Alexander's mother's home. Tiffany Robbins was crying and asking for her daddy. Later, Tiffany told her mother that the neighbor shot her daddy. She picked Alexander out of a group of photographs as the man who "shot [her] dad."

Alexander contends that the evidence was insufficient to sustain his murder conviction.[1] This contention might be fairly said to question both the legal and factual sufficiency of the evidence. In determining whether evidence is legally sufficient to support a verdict, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Nelson v. State,* 848 S.W.2d 126, 131 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993). In reviewing the factual sufficiency of the evidence, we look at all of the evidence and determine whether the conviction is so against the great weight of the evidence as to be manifestly unjust. *Bigby v. State,* 892 S.W.2d 864, 875 (Tex.Crim.App. 1994); *Lisai v. State,* 875 S.W.2d 35, 37 (Tex.App.—Texarkana 1994, pet. ref'd). The trier of fact is free to accept or reject any or all of any witness's testimony. *Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); *Green v. State,* 892 S.W.2d 220, 222 (Tex.App.—Texarkana 1995, pet. ref'd). In the light most favorable to the verdict, we will examine the evidence adduced at trial.

Elroy Carrillo, a detective with the Dallas Police Department, testified that on February 1, 1992, at approximately 8:19 p.m., he was called to investigate a shooting at an apartment complex located at 11,100 Kingsley Road in Dallas, Texas. Upon arrival at that location, Detective Carrillo saw the victim, Joe Patrick Robbins, lying on the ground in the parking lot. Detective Carrillo testified that Robbins was choking, trying to pull himself up on a parked car, was bleeding from his head, and smelled of alcohol. Detective Carrillo then tried to apply pressure to the wounds to stop the bleeding until the ambulance arrived. Detective Carrillo also testified that, at the time he arrived at the scene, there were no other persons in the parking lot and he observed a taxicab trying either to park or to leave the complex.

Sheila Spotswood, a Dallas County Medical Examiner, testified that she performed an autopsy on Robbins on February 2, 1992. Spotswood testified that Robbins died from a

---

1. A person commits murder if he or she intentionally or knowingly causes the death of an individual. Tex.Penal Code Ann. § 19.02(a)(1) (Vernon 1989), amended by Act of May 29, 1993, 73rd Leg., ch. 900, § 1.01, 1993 Tex.Gen.Laws 3586, 3613, current version found at Tex.Penal Code Ann. § 19.02(b)(1) (Vernon 1994).

gunshot wound to the head and that the trajectory of the bullet wound was from the left and slightly downward. Spotswood was unable to determine the range of fire, but believed the shot to be from a distance of at least several feet. She further testified that there were no indications that Robbins had recently fired a firearm and that Robbins had a blood alcohol level of .26 percent.

Joanne Andreotta, the evidence registrar for the Dallas County Medical Examiner's Office, testified she received a pair of blue jeans that had been removed from Robbins by the medical examiner and then submitted the jeans to the serology department of the crime laboratory. Michelle Skidmore, a former forensic serologist for the Dallas County Crime Laboratory, testified she received the jeans and conducted tests in an attempt to determine the source of some blood found on the jeans. She was unable, however, to determine the source of the blood.

Lannie Emanuel, a firearms examiner with the Dallas County Institute of Forensic Sciences, examined the bullet fragments retrieved from Robbins's body and determined they were probably fired from a revolver and were consistent with a .38 or .357 caliber bullet.

Officer Karl David Kemper, a police officer employed by the City of Dallas, also responded to the shooting call. Officer Kemper testified that he questioned members of the crowd gathered at the scene, but none had seen the shooting. Officer Kemper talked with Rhonda Clinton by mobile telephone. She gave Officer Kemper a description of a person she saw standing over Robbins's body.

Rhonda Clinton testified that, as she was travelling with her family along Kingsley Road on the evening of February 1, 1992, she heard a loud noise. As she turned toward the direction from which the noise came, she saw a man standing in an apartment parking lot, facing away from her, with his arm extended and pointing toward the ground. Clinton testified that it appeared that the man was holding a gun, and she saw some-

one's legs on the ground behind the man. The second time she looked, she could see the man's profile. The third time she looked, she saw a taxicab parked in the apartment parking lot.

After she reached home, she called the police,[2] and her husband went back to the scene and spoke with Officer Kemper. She later gave a description by telephone of the man she saw standing over Robbins. She described the man as dark and "thick through the ... upper body." In March of 1993, Clinton was shown some pictures by the police and selected a photograph that was not Alexander. She admitted she never saw the man's face.

James Odom, a paramedic who accompanied Robbins to the hospital, testified that Robbins did not make any statements on the way to the hospital.

Patrick Genovese, a physical evidence officer with the Dallas Police Department, was called to the scene to search for evidence. Genovese testified he found no weapons, shell casings, or identifiable fingerprints at the scene.

Sherry Raley, the former manager of the Kingsley Court Apartments, testified that Robbins lived in apartment 146 with his daughter, Tiffany Robbins. Raley further testified that Alexander lived in the adjacent apartment, number 147, with his wife, Linda Alexander, his daughter, Tatiana Alexander, and his son, Rothel Mathis.

Patrice Olootu testified that she was visiting a resident at the Kingsley Court Apartments, Ezekiel Fiesheton, on the evening of February 1, 1992, when she heard two gunshots. She then looked out the apartment window toward the parking lot and saw a taxicab driver get out and run across the street to a convenience store. She did not see anyone with a gun in the parking lot.

Anthony Osuchukwu, a cab driver and a resident at the Kingsley Court Apartments, testified that as he was pulling into the apartment parking lot on the evening of Feb-

2. Samantha Griffin, the custodian of records for MetroCel Cellular Telephone Co., corroborated

Clinton's emergency call.

ruary 1, 1992, he heard a gunshot. He then got out of his cab, ran across the street to a convenience store, and asked the clerk to call the police. He did not see the victim or an assailant.

David Silmon, a maintenance worker at the Kingsley Court Apartments, testified that he and his family were returning to their apartment after 7:00 p.m. on February 1, 1992, and passed in front of Alexander's and Robbins's apartments. He testified he thought there was a party in Alexander's apartment because there was loud music and people talking.

Kenny Williams, a former resident of the Kingsley Court Apartments, testified that he saw Alexander barbecuing outside his apartment on February 1, 1992, and spoke with him. He testified that Alexander introduced him to Robbins, his next-door neighbor. Williams further testified he had been in Alexander's apartment, and Alexander had a glass-topped coffee table.

Ronnie Dean, a friend of Alexander's, testified that at approximately 5:00 on the evening of February 1, 1992, he went to Alexander's apartment for a barbecue. He also testified that Alexander introduced him to Robbins that day and that there was music playing in Alexander's apartment. Dean testified that Robbins departed the party, leaving his daughter with Alexander's daughter. Around 6:30 p.m. to 7:30 p.m., Dean took Alexander to Alexander's mother's house and then returned home.

Anthony Jackson, a sergeant with the Dallas Police Department, testified he interviewed Dean in May of 1992, and pointed out some discrepancies between Dean's present version of the facts and those given during his interview. For example, he testified that Dean told him he had been to Alexander's for a barbecue on February 1, 1992, and Alexander had introduced his son and daughter as his niece and nephew. He further testified that Dean said he stayed at Alexander's mother's house and "listened to music and sat around the house," rather than merely dropping off Alexander. Jackson also testified that Dean told him that Alexander's

daughter had stayed with Alexander's niece and nephew and Tiffany Robbins.

Roy R. George, a detective with the Dallas Police Department, testified he investigated Robbins's apartment after the offense. George testified he took latent, identifiable fingerprints. He did not testify, however, to whom the prints belonged. George testified the apartment was clean and orderly and did not show signs of a burglary.

Stephanie Sanders, Alexander's sister, testified she was giving a wedding shower for a friend on February 1, 1992, and did not remember whether she left her children with Alexander or whether she went to Alexander's apartment that day. Gregory Sanders,[3] Alexander's nephew, also testified, but could not remember going to a barbecue at Alexander's home.

Tatiana Alexander testified she did not remember the events of February 1, 1992, specifically, but did remember a day in early 1992 when Alexander barbecued. She testified that Robbins and Dean stopped by that day, which was the last time she saw Robbins. She testified her cousins did not come over that day and that she, Alexander, her mother, Linda Alexander, and Tiffany Robbins spent the night with her grandmother. She also testified that Alexander had a glass-topped coffee table in his apartment.

Jullianne Robbins, the victim's estranged wife, testified that her daughter Tiffany was staying with Robbins on the evening of February 1, 1992. She further testified she was concerned about Tiffany because she did not learn of the murder until Sunday, and she had assumed Tiffany had been with Robbins Saturday and Sunday. She later went over to Robbins's home to dispose of his effects and asked Alexander to keep Robbins's fish tank. She testified that this made Alexander apprehensive, but he complied. She also testified she did not see a glass-topped coffee table in Alexander's apartment at that time. She further testified that several months after the murder, Tiffany told her the neighbor shot her daddy.

Detective Robert Ermatinger, with the Dallas Police Department, testified that he

---

**3.** Stephanie Sanders's husband and son are both named Gregory Sanders. Both testified at trial.

went to the Kingsley Court Apartments to investigate Robbins's murder on the morning of February 2, 1992. He testified that although he found no eyewitnesses to the event, he received reports of persons who heard shots. He was directed by a neighbor, Jim Lett, to the victim's apartment and inside found Robbins's keys and a wallet filled with $500 cash. Ermatinger also testified that Linda Alexander told him she had Tiffany Robbins in her care, and he then made arrangements to deliver Tiffany to the custody of Robbins's next of kin, Charles Slodki.

Ermatinger testified he interviewed Alexander on February 17, 1992, and that Alexander told him that Robbins had been to his home on February 1, 1992, for a barbecue. Ermatinger testified that Alexander told him in a second interview that Robbins's daughter had played with Alexander's daughter that day and that Robbins told him that he was upset because he did not have friends or anyone who loved him. Ermatinger testified that Alexander then tried to comfort Robbins and invited him and his daughter to go to church with him. Robbins declined, but Tiffany spent the night with his family at his mother's home. Ermatinger testified that Alexander further stated that Ronnie Dean gave him a ride to his mother's home because Alexander's wife's car had broken down. Alexander's children later arrived at Alexander's mother's house with Alexander's mother and Tiffany, who cried for her father.

Ermatinger further testified that in an interview with Ronnie Dean, Dean told him that Alexander's niece and nephew were at Alexander's on February 1, 1992. Ermatinger stated that Dean told him the reason Tiffany spent the night with the Alexanders was so that she could play with Alexander's niece and nephew.

Ermatinger further testified that he showed Tiffany Robbins a photographic lineup containing a picture of Alexander on March 16, 1993. Ermatinger testified that Tiffany picked out Alexander as someone she knew and said that Alexander had "shot [her] dad."

Gregory Sanders, Alexander's brother-in-law, testified that on the evening of February 1, 1992, he received a telephone call on his answering machine from his wife, Stephanie Sanders. He tried to return her call, left a message with his mother, and Stephanie returned his call at 10:54 p.m.

Tiffany Robbins testified that, on the day of the murder, she and Robbins were at Alexander's home and she was playing with three children. She testified that Alexander went to the closet and got a gun. She testified that Robbins broke the coffee table by throwing it to the ground, Robbins ran out of the apartment, and Alexander followed him with a gun. Tiffany testified the gun was black and small.

Tiffany further testified she heard two gunshots while she was in Alexander's apartment. She then ran outside and saw her father lying in the parking lot with blood on his knees and forehead. She testified she then began crying and did not remember where she spent the night.

■ Alexander contends that the evidence is insufficient to prove that Alexander fired the shots that killed Robbins because no one saw the offense occur. Homicide, however, may be proven by circumstantial evidence. See Harris v. State, 738 S.W.2d 207, 220 (Tex.Crim.App.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). The standard of review in a circumstantial case is no different from the standard for direct evidence. Christian v. State, 686 S.W.2d 930, 934 (Tex.Crim.App.1985); Taylor v. State, 684 S.W.2d 682, 684 (Tex.Crim.App.1984); Martinez v. State, 880 S.W.2d 72, 77 (Tex.App.—Texarkana 1994, no pet.). The question, therefore, is whether a rational jury could have found that Alexander intentionally or knowingly caused Robbins's death.

■ In the present case, there was evidence that Robbins was at Alexander's home for a barbecue just before his death; that Robbins broke Alexander's coffee table and ran from the apartment; that Alexander followed Robbins in the direction of the parking lot with a gun in his hand; that shortly thereafter, two gunshots were heard by several different witnesses; that after the shots were fired, Tiffany Robbins found Robbins in the parking lot with gunshot wounds; and that a witness saw a man standing over a

body in the parking just after the gunshots were fired. Based on these facts, a rational jury could have determined that Alexander intentionally or knowingly caused the death of Robbins. Additionally, based on all of the evidence, the conviction is not so against the great weight of the evidence as to be manifestly unjust. This point of error is overruled.

■ By his next point of error, Alexander contends the trial court erred in permitting prejudicial impeachment of a witness to the effect that Stephanie Sanders refused to appear to testify in an earlier proceeding despite reasonable efforts by the State. A trial court has wide discretion in determining the admissibility of evidence. *Green v. State,* 880 S.W.2d 198, 202 (Tex.App.—Texarkana 1994, no pet.). The determination of the admissibility of evidence is within the sound discretion of the trial court and will not be reversed on appeal unless a clear abuse of discretion is shown. *Werner v. State,* 711 S.W.2d 639, 643 (Tex.Crim.App.1986); *Green,* 880 S.W.2d at 202.

■ The State argues that Alexander has waived this point because it does not comport with his objection at trial. Grounds of error urged on appeal must comport with objections made at trial, or error is not preserved. *Burks v. State,* 876 S.W.2d 877, 908 (Tex. Crim.App.1994), *cert. denied,* — U.S. —, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *Butler v. State,* 872 S.W.2d 227, 236 (Tex.Crim.App. 1994), *cert. denied,* — U.S. —, 115 S.Ct. 1115, 130 L.Ed.2d 1079 (1995); *Tasby v. State,* 679 S.W.2d 78, 79 (Tex.App.—Texarkana 1984, no pet.).

At trial, Alexander objected to this line of questioning on the bases that it was irrelevant and prejudicial. On appeal, however, he argues that this is improper impeachment because the "trial court must balance the probative value of the evidence of bias against the dangers of unfair prejudice, embarrassment or harassment of the witness and confusions of the issues." *See* TEX. R.CRIM.EVID. 401, 403. An objection that the evidence is not relevant is not synonymous with an objection that the evidence fails the probative/prejudicial balancing test. *See Montgomery v. State,* 810 S.W.2d 372, 389

(Tex.Crim.App.1990) (opinion on reh'g). Thus, the State argues that this point of error has not been adequately preserved for appellate review.

■ Assuming *arguendo* that this point has been preserved, this point of error still fails. The fact that Sanders was called by the State does not prevent the State's impeachment of Sanders to show her possible bias. A party may impeach his own witness without first showing surprise or injury. TEX.R.CRIM.EVID. 607. One way for a party to impeach a witness is to examine him or her concerning bias, interest, prejudice, or any other matter which might affect the witness's credibility. *See* TEX.R.CRIM.EVID. 612(b); *Perkins v. State,* 887 S.W.2d 222, 226 (Tex.App.—Texarkana 1994, pet. ref'd). Any motive that operates on the mind of a witness during testimony is material to the trial because of its effect on the witness's credibility. *Perkins,* 887 S.W.2d at 226, *citing Coleman v. State,* 545 S.W.2d 831, 834 (Tex.Crim.App. 1977).

■ In the present case, the trial court determined that the evidence of Sanders's failure to appear to testify in an earlier proceeding despite reasonable efforts by the State was proper. Because this is within the trial court's discretion, this point of error is overruled.

■ In his next point of error, Alexander contends that the trial court erred in overruling Alexander's objections to the punishment argument by the State which referred to community expectations of a life sentence. Proper jury argument includes:
- summation of the evidence;
- reasonable deduction from the evidence;
- answer to argument of opposing counsel; and
- plea for law enforcement.

*Todd v. State,* 598 S.W.2d 286, 296–97 (Tex. Crim.App. [Panel Op.] 1980); *Dunbar v. State,* 551 S.W.2d 382, 384 (Tex.Crim.App. 1977); *Alejandro v. State,* 493 S.W.2d 230, 231 (Tex.Crim.App.1973). Remarks of counsel during final argument must be considered in the context in which they appear. *Gaddis v. State,* 753 S.W.2d 396, 398 (Tex.Crim.App.

1988); *Denison v. State,* 651 S.W.2d 754 (Tex.Crim.App.1983). Counsel is allowed wide latitude in drawing inferences from the evidence, provided those inferences are reasonable, fair, legitimate, and offered in good faith. *Gaddis,* 753 S.W.2d at 399. Even when a party's counsel makes an impermissible jury argument, it is not reversible "unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute or injects new facts, harmful to the accused into the trial proceeding." *Todd,* 598 S.W.2d at 297; *see also Kinnamon v. State,* 791 S.W.2d 84, 89 (Tex.Crim.App.1990); *Gaddis,* 753 S.W.2d at 398; *Brandley v. State,* 691 S.W.2d 699, 712–13 (Tex.Crim.App.1985).

■ In the present case, Alexander complains of the following argument by the State:

> You give this man exactly what he deserves and what the victims in this case, or the victim's next of kin and loved ones, deserve, for this man to serve a life sentence. It's only proper, and *it serves the interest of this community as a whole.*

(Emphasis added.)

Alexander contends that this is improper jury argument because it implies that the community at large expects or desires a particular verdict.

■ With regard to pleas for law enforcement, the Texas Court of Criminal Appeals has held that the State may argue the impact of the jury's verdict on the community. *Borjan v. State,* 787 S.W.2d 53, 56 (Tex. Crim.App.1990); *Adams v. State,* 685 S.W.2d 661, 671 (Tex.Crim.App.1985); *Stone v. State,* 574 S.W.2d 85, 90 (Tex.Crim.App.1978). It is improper, however, for the State to argue that the community expects or demands a particular sentence or punishment. *Borjan,* 787 S.W.2d at 56; *Cortez v. State,* 683 S.W.2d 419, 420 (Tex.Crim.App.1984). The argument in the present case is more like the former, i.e., an argument as to the impact of the jury's verdict on the community. Therefore, this point of error is overruled.

■ Alexander next contends the trial court erred in denying Alexander's objections to the State's use of peremptory challenges against two minority venire members. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the State from striking potential jurors solely on the basis of their race. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Keeton v. State,* 724 S.W.2d 58, 64–65 (Tex.Crim.App.1987). In order to invoke his or her *Batson* protections, a defendant must first make a prima facie showing that the State's use of peremptory challenges was racially motivated. *Wheatfall v. State,* 882 S.W.2d 829, 835 (Tex. Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 742, 130 L.Ed.2d 644 (1995); *Chambers v. State,* 866 S.W.2d 9, 23 (Tex. Crim.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994). An appellate court may infer that the trial court found a prima facie case when the trial court held a hearing on the matter. *See Tennard v. State,* 802 S.W.2d 678, 681 (Tex.Crim.App. 1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991).

■ Once the defendant demonstrates a prima facie case, the burden then shifts to the State to show a racially neutral reason for striking the minority venire members. *Batson,* 476 U.S. at 94, 106 S.Ct. at 1721, 90 L.Ed.2d at 86; *see also Keeton v. State,* 749 S.W.2d 861, 862 (Tex.Crim.App.1988). The State's explanation need not rise to the level of justifying a challenge for cause, but the State must articulate a racially neutral explanation related to the particular case. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

■ The trial court must then determine whether, despite the State's explanation, the defendant has established purposeful discrimination. *Tennard,* 802 S.W.2d at 681, *quoting Keeton,* 724 S.W.2d at 65; *see also Tompkins v. State,* 774 S.W.2d 195, 202 (Tex. Crim.App.1987), *aff'd,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (explaining that it remains the ultimate burden of the accused to persuade the trial judge by a preponderance of the evidence that the allegations of purposeful discrimination are true).

■ In reviewing this determination, the appellate court uses the "clearly erroneous"

standard articulated in Federal Rule of Civil Procedure 52(a), under which the findings of the trial court should not be disturbed if they are supported by the record. *Tennard*, 802 S.W.2d at 680; *Whitsey v. State*, 796 S.W.2d 707, 726 (Tex.Crim.App.1989) (opinion on reh'g).

■ In the present case, Alexander objects to the State's use of peremptory strikes against two minority venire members. The State responded at trial that the venire members were stricken because each had close relatives who had been convicted of a felony—one for attempted murder and one for aggravated robbery. Alexander then attempted to prove that this reason was pretextual by showing that the prosecution did not question these jurors on whether the fact that they had relatives who had been convicted of a felony would impact their jury service. The State then pointed out that the only white juror who was given this question was excused because he failed to show up for the afternoon session. The court accepted the State's reason as "racially neutral" and held that Alexander had not met his *Batson* burden of proof.

Alexander argues on appeal that the State should have questioned these jurors in depth concerning any biases before utilizing a peremptory strike on them. The State did, however, ask one of the two jurors if this relationship would affect her ability to serve on this case. Additionally, the State inquired as to the date of the offenses with regard to both venire members.

■ Texas courts have held that strikes of a prospective juror on the basis that he or she has a family member or close friend who had been arrested, charged, or convicted of a crime are race neutral. *Murray v. State*, 861

S.W.2d 47, 52 (Tex.App.—Texarkana 1993, pet. ref'd); *Garcia v. State*, 833 S.W.2d 564, 567 (Tex.App.—Dallas 1992), *aff'd on other grounds*, 868 S.W.2d 337 (Tex.Crim.App. 1993); *Sims v. State*, 768 S.W.2d 863, 865 (Tex.App.—Texarkana 1989), *pet. dism'd per curiam*, 792 S.W.2d 81 (Tex.Crim.App.1990). This information can be obtained by the State from sources other than voir dire. There is no evidence in the record that the State used this legitimate reason as a pretext for discrimination. Because the trial court's ruling was not clearly erroneous, this point of error is overruled.

By his next point of error, Alexander contends that the trial court erred in denying his motion for mistrial after a juror communicated a question to the bailiff, which was then communicated to the prosecuting attorney.

■ The trial court's decision of whether to grant a motion for a mistrial is not to be disturbed on appeal absent a showing of abuse of discretion. *Gilbert v. State*, 840 S.W.2d 138, 141 (Tex.App.—Houston [1st Dist.] 1992, no pet.); *Baker v. State*, 797 S.W.2d 406, 408 (Tex.App.—Fort Worth 1990, pet. ref'd); *Bratcher v. State*, 771 S.W.2d 175, 188 (Tex.App.—San Antonio 1989, no pet.); *Smith v. State*, 638 S.W.2d 200, 202 (Tex.App.—Houston [1st Dist.] 1982, pet. ref'd, untimely filed); *see also Beck v. State*, 573 S.W.2d 786, 791 (Tex.Crim.App. [Panel Op.] 1978).

Alexander moved for a mistrial on the basis that a bailiff passed along to the prosecutor a question the bailiff received from a juror and that, in response to this question, the prosecutor recalled a witness. Alexander made an oral motion for a mistrial, stating the basis of his motion.[4] Alexander attempt-

---

4. MR. WATSON: Your Honor, we have a motion that needs to be done outside the presence of the jury.

   THE COURT: Okay. Let's hear it.

   MR. WATSON: Your Honor, at this time the Defense moves for a mistrial. I believe a communication from a juror was made regarding some testimony of Detective Jackson yesterday. The Prosecution recalled Detective Jackson this morning and cleared up the testimony as to who was present, which of the nieces and nephews were present, which parties were present, and it's—These are material—

   THE COURT: Well, where is the error? I'm sorry. You lost me.

   MR. WATSON: Well, with all due respect to all parties involved, as I understand, a juror yesterday talked—or mentioned to a Bailiff—to the Bailiff that she didn't understand who was present, and the Bailiff passed this on to Mr. Reed, and Mr. Reed recalled Detective Jackson and cleared it up, and they recalled him as to which nieces and nephews were there, and the question or statement to the Bailiff was not mentioned to the Court in a timely manner, or to me and was relayed directly to the Prosecutor.

ed to call witnesses, but the trial court would not permit this.[5] The trial court overruled the motion on the basis that the only party with whom the juror communicated was the bailiff.[6]

The applicable statutes cited by Alexander include TEX.CODE CRIM.PROC.ANN. art. 36.22 (Vernon 1981),[7] which states:

No person shall be permitted to be with a jury while it is deliberating. *No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.*

(Emphasis added.) The pertinent portion of TEX.CODE CRIM.PROC.ANN. art. 36.24 (Vernon 1981) entitled "Officer shall attend jury" reads as follows:

The sheriff of the county shall furnish the court with a bailiff during the trial of any case to attend the wants of the jury and to act under the direction of the court.

■■■ No presumption of injury arises from the bailiff's association with the jury. *Holder v. State,* 140 Tex.Crim. 55, 143 S.W.2d 613, 616 (1940); *Gandy v. State,* 139 Tex.Crim. 343, 140 S.W.2d 182, 187 (1940). There is no error when the bailiff communicates to the jury on logistical matters not dealing with the case on trial; however, there are numerous Texas cases providing that a bailiff's communications with the jury about the case on trial constitutes error. *See, e.g., Stecher v. State,* 373 S.W.2d 255 (Tex.Crim.App.1963); *Clark v. State,* 163 Tex.Crim. 54, 289 S.W.2d 288 (1956); *Lee v. State,* 122 Tex.Crim. 379, 56 S.W.2d 453 (1933).

■■■ For anyone outside of the judicial process to communicate to the jury about the

case on trial is error. TEX.CODE CRIM.PROC. ANN. art. 36.22 (Vernon 1981). We are not unmindful that a bad precedent would be set by allowing ex parte communication from the jury to counsel in the case, even if indirectly done. If the district attorney is allowed to receive communications through the bailiff from the jurors, then it would be equally appropriate for the defense attorney to receive communications from the jury through his or her investigator.

Some confusion has arisen concerning the term *authorized person.* In the case of *Jackson v. State,* 403 S.W.2d 145 (Tex.Crim. App.), *cert. denied,* 385 U.S. 938, 87 S.Ct. 301, 17 L.Ed.2d 217 (1966), the Court interprets Article 671 of the Code of Criminal Procedure, which is now Article 36.22. In the *Jackson* case, the court clearly distinguishes between the first sentence of Article 36.22, dealing with persons permitted to be *with the jury* while it is deliberating, from the second sentence, which refers to persons *conversing with a juror.* The Court held that the sheriff was not an unauthorized person to associate with the jury, and thus, no presumption of injury would arise from his association with the jury. This is not a case involving communication with the jury about the case. According to the Court of Criminal Appeals, the trial court instructed the sheriff not to discuss the case with the jury, and there was no showing that the sheriff said anything about the case to the jury. Thus, the holding of the Court that no presumption of injury would arise referred solely to the sheriff's association with the jury and not to any statement made about the case to the jurors.

5. MR. WATSON: Could—Your Honor, to—to—only to preserve error—

THE COURT: Well, I've heard the motion. Have you got anything else? I mean, I—

MR. WATSON: Well, do I need—I'd like to, I guess, put on testimony as to what discussion—what question was asked of the Bailiff and what—

THE COURT: Well, for the purposes of the motion, I'm going to assume that what you say happened. I'm still overruling it.

6. THE COURT: Well, there hasn't been any communication between the juror and anybody other

than the Bailiffs, so I'm going to overrule your motion.

MR. WATSON: Well, Your Honor, I believe—And with all due respect to all parties, I believe the Bailiff communicated that question directly to the Prosecutor yesterday.

THE COURT: I overrule your motion.

7. Another similar provision was found in Article 40.03(7) of the Code of Criminal Procedure, but was deleted by Acts 1993, 73rd Leg., ch. 900, § 5.03, eff. Sept. 1, 1993. This provided for a new trial "where a juror has conversed with any person in regard to the case."

A series of earlier cases decided by the Court of Criminal Appeals suggest that an error of outside communications with the jurors about the case should be analyzed on a pure harm basis. *Stecher,* 373 S.W.2d 255 (considering "the court's certification and the maximum punishment being assessed"); *Clark,* 289 S.W.2d at 290–91; *Choiniere v. State,* 150 Tex.Crim. 582, 204 S.W.2d 840, 841 (1947) (stating that any error arising from a deputy sheriff, functioning as a bailiff, conversing with the jury about the charge "was harmless and could not have possibly injured the accused in any way"); *but see Lee v. State,* 56 S.W.2d 453 (holding that a sheriff acting as a bailiff instructing the jury on the law was harmful as a matter of law).

Later cases, however, provide that when anyone outside of the court makes an unauthorized communication with a juror about the case on trial, a presumption of injury arises. *Green v. State,* 840 S.W.2d 394, 406 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993); *Mayo v. State,* 708 S.W.2d 854, 856 (Tex. Crim.App.1986); *Thomas v. State,* 699 S.W.2d 845, 853 (Tex.Crim.App.1985); *Mize v. State,* 754 S.W.2d 732, 739 (Tex.App.— Corpus Christi 1988, pet. ref'd). Although these cases speak of an unauthorized person, the statute is clear that no person is authorized to converse with a juror *about the case* outside of the court and without the permission of the court. Therefore, the distinction that these later cases did not involve bailiffs is not a meaningful distinction. The only significance of the fact that a bailiff is involved concerns being associated with the jury during trial, *not* talking to the jury about the case.

The complaining party must establish that a communication occurred between a juror and someone else, that the communication involved the specific case at trial, and that it consisted of more than an innocuous, unrelated comment or exchange. *Chairs v. State,* 878 S.W.2d 250, 253 (Tex.App.—Corpus Christi 1994, no pet.).

This presumption of injury, however, may be rebutted by the State. *Green,* 840 S.W.2d at 406; *Mayo,* 708 S.W.2d at 856; *Thomas,* 699 S.W.2d at 853. The State may rebut this presumption by showing that the accused has not been injured, i.e., "that the case was not discussed or that nothing prejudicial to the accused was said." *Green,* 840 S.W.2d at 406.

▇▇ Once the defendant has offered evidence that there was an unauthorized communication with a juror about the case on trial, then the State bears the burden of overcoming the presumption of harm.[8] This does not mean that the State is required to put on repetitive evidence if the rebutting evidence is already before the court. If evidence is in the record that rebuts the presumption of harm, it should be considered, whether presented by the State or the defense. In the present case, the evidence amounted to a stipulation. The statement by counsel that was accepted by the court went beyond establishing that there was a communication concerning the case, but it also detailed the contents of the conversation.

▇▇ In the *Morrison* case cited by Alexander, the appellate court was dealing with a situation in which the trial court had permitted jurors, as part of the judicial process, to submit questions in open court under the supervision of the judge. *Morrison v. State,* 845 S.W.2d 882 (Tex.Crim.App.1992). The *Morrison* case held that the error was not subject to a harm analysis. In the present case, however, there was an ex parte communication to the district attorney through the bailiff, which resulted in a witness being asked specific questions.

Alexander suggests that the present case amounts to a more flagrant violation of the rules than in *Morrison* and therefore should not require the showing of harm. It is correct that the facts of the *Morrison* case do not represent an ex parte communication by a juror, but rather a procedure conducted and approved by the trial court. In dealing with the facts of the *Morrison* case, the Court of Criminal Appeals faced a situation

---

**8.** Although the State did not argue harmless error on appeal, this Court has a fundamental duty under Rule 81(b)(2) of the Rules of Appellate Procedure to make a determination beyond a reasonable doubt that an error made no contribution to the conviction or the punishment.

in which it was being asked to approve a drastic change in the procedure for conducting the trial. There are many ramifications to allowing such a procedure. The Court said in *Morrison:*

> Where the role of the jury as a neutral fact-finding body is significantly modified, the underpinnings of our system, designed to ensure trial by a fair and impartial jury are likewise compromised. A determination of harm in this context is virtually impossible.

845 S.W.2d at 889. The Court of Criminal Appeals chose to disallow all juror questions to witnesses instead of trying to sort out every case to see whether there was harm. The present case does not present facts that ask the court to approve a new trial court procedure, but rather represents an isolated happening that had not been preapproved by the trial court. We find that this case is distinguishable on that basis from the *Morrison* case and is subject to the harm analysis.

According to the facts before us, the bailiff in the present case did not in any way try to answer any question for the juror or advise the juror in any way, but rather passed on the juror's concern to the prosecutor. Sgt. Jackson clarified that Ronnie Dean had told him about who was present at Alexander's apartment on the day of the murder. Jackson testified that when he said in his earlier testimony that Ronnie Dean told him that his (Dean's) daughter was present, he meant to say that Dean told him Alexander's daughter was present. Tatiana Alexander, testified that she did not remember any of the events that occurred at the shooting, but only remembered that her father had a barbecue one day early in 1992 and that Robbins (the victim) and Ronnie Dean were there and that her father had a glass-topped coffee table.

On first blush, it appears that this testimony does not relate to matters in dispute, does not affect the ultimate issues in the case and, therefore, might be considered harmless error under Rule 81(b)(2). But, in *Harris v. State,* 790 S.W.2d 568 (Tex.Crim.App.1989), the Court of Criminal Appeals in interpreting the harmless error rule has required the application of specific tests to determine the harmless error analysis. We set out the tests below and apply them to the present case:

- **The reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial, but instead it should be concerned with the integrity of the process.**

In applying this test to the present case, there is no question that allowing jurors to communicate ex parte to the attorneys in the case outside the courtroom would be damaging to the integrity of the judicial process.

- **The court should examine the source of the error and the nature of the error.**

Although the error initially originated with the juror and the bailiff, the prosecutor should have reported the communications to the court in open court to avoid his having knowledge of the matter without opposing counsel and the court being aware of it.

- **Whether or to what extent the error was emphasized by the State.**

In the present case, the State emphasized the inconsistencies in evidence tending to be favorable to Alexander both in the examination of the witnesses and in the final argument. Therefore, there was an important strategy for the State to try to make its testimony and evidence as consistent as possible. The importance of the testimony in question, put in evidence by the State after receiving the ex parte communication, was to clarify that Alexander's daughter, Tatiana Alexander, was present at Alexander's apartment on the day of the murder. Other State witnesses had testified that she was present in Alexander's apartment on that day. Otherwise, the defense would have been able to point out the discrepancies and inconsistencies in the evidence favorable to the State and thus counter the State's strategy in pointing out the inconsistencies in the evidence favorable to the defense.

- **The question is whether the jury might have been influenced by the error, not whether in our judgment the correct result was reached. The appellate court cannot substitute itself for the jury by deciding the untainted evidence is so overwhelming that if the jury had been compelled to rely**

upon it alone, it would have convicted. Such an application is the substituting of the appellate court for the jury as fact finder. The reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision making.

This is always a difficult area of analysis for an appellate court. Certainly, this juror thought that this matter was important enough for him to approach the bailiff and ask him about it, and the State thought it was important enough in its evaluation of what importance might be placed upon the testimony to recall a witness to clarify the matter. This juror may have discussed this inconsistent evidence with the other jurors. It is impossible for us to say in the present case that the State's recalling a witness on the basis of that ex parte communication had no effect on the jury.

• **Whether declaring the error harmless would encourage the State to repeat it with impunity.**

In the present case, a holding that this error was harmless could encourage the State to risk accepting this type of communication on the basis that it might not be considered harmful error. The State's error was in receiving this unauthorized communication and then not reporting it immediately to the court and opposing counsel. All such communications, whether solicited or not solicited, should be discouraged.

• **The appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of the other evidence. If overwhelming evidence dissipates the error's effect upon the jury's function in determining the fact, and thus did not contribute to the verdict, then the error is harmless.**

In the present case, it is difficult to calculate the probable impact of the error on the jury. Certainly, inconsistency in the evidence favorable to the State can be an important factor in the jury's evaluation of the credibility of witnesses. Thus, if this inconsistency had not been corrected by the State, this could have been a factor in discrediting

the source of the State's evidence. We cannot say beyond a reasonable doubt that this error did not contribute to the verdict.

The judgment of the trial court is reversed, and the case is remanded for a new trial.

CORNELIUS, Chief Justice, dissenting.

I believe the error in this case was clearly harmless, so I respectfully dissent to the reversal. Using the tests for harmless error set out in the majority opinion, I make these observations:

• The integrity of the process was not compromised. The communication between the juror and the bailiff was not about the merits of the case or about any ultimate or critical issue. The bailiff did not attempt to answer the juror's question. Nor did the prosecutor attempt to communicate with the juror; he simply tried to clarify the testimony of an officer who had previously testified about the presence of a nonessential witness at the crime scene.

• The source and nature of the error were innocuous. The juror and the bailiff acted in good faith, and there was no attempt on anyone's part, including the prosecutor, to contaminate the jury deliberations with any interference or extraneous evidence.

• The State did not emphasize the error. In fact, this criterion is not even applicable to a harmless error analysis for the kind of error involved in this case. The error was the bailiff's communication with a juror. Certainly, no one emphasized, or even mentioned, that event to the jury. All the State did was to produce additional evidence on a minor point to clarify previous testimony, and that testimony was not emphasized.

• Declaring this error harmless would certainly not encourage the State to repeat it. Indeed, the actual error assigned in this case is the juror's communication with the bailiff and the bailiff's relay of the communication to the prosecutor—not the prosecutor's attempt to clarify the previous testimony. Obviously, the State cannot repeat this error because it did not commit it in the first place.

• The error could not have had an impact on the jury in any material way, because no

extraneous evidence or influence was brought to bear on the jury, and the clarification evidence was completely immaterial to the issues of the case. The overwhelming evidence clearly dissipates any effect on the jury's function of determining the facts, and the error did not contribute to the verdict. The prosecutor merely had Sergeant Jackson clarify what Ronnie Dean had told him about who was present at the scene. Jackson testified that when he said in his earlier testimony that Ronnie Dean told him that his (Dean's) daughter was present, he meant to say that Dean told him Alexander's daughter was present. Alexander is the appellant. His daughter, Tatiana Alexander, testified fully at the trial. She said she did not remember any of the events that occurred at the shooting. She said she only remembered her father had a barbecue one day early in 1992, that Robbins (the victim) and Ronnie Dean were there, and that her father had a glass-topped coffee table. All of this testimony related to matters that were undisputed, and the testimony added nothing to the case.

As the error was clearly harmless, I would affirm the conviction.