# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00692-CR
## NO. 03-01-00693-CR
## NO. 03-01-00694-CR
## NO. 03-01-00695-CR

**Roy Neal Martin, Appellant**

**&**

**Rachel L. Martin, Appellant**

**&**

**Melissa Diane Mayo, Appellant**

**&**

**James Edward Mayberry, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 2 OF BELL COUNTY**
**NOS. 2C01-01310, 2C01-01309, 2C01-01253 & 2C01-01252,**
**HONORABLE JOHN BARINA, JR., JUDGE PRESIDING**

---

Appellants Roy Martin, Sr., Rachel Martin, Melissa Mayo, and James Mayberry appeal from their convictions of the offense of promotion of obscene materials. *See* Tex. Pen. Code Ann. ' 43.23(c)(1) (West 1994). The jury assessed the punishment of appellant Roy Martin, Sr. at confinement in the county jail for fifteen days and a fine of $4,000, of appellant Rachel Martin at

confinement in the county jail for one day and a fine of $800, of appellant Melissa Mayo at confinement in the county jail for one day, and of appellant James Mayberry at confinement in the county jail for 120 days and a fine of $4,000.

Appellants were tried jointly; they were represented by the same attorney both on trial and on appeal; they raise the same issues on appeal. Appellants assert that the material they were convicted of promoting was not obscene. Also, they assert that the trial court erred in refusing to strike or reform the jury, in restricting appellants= opening statement, in allowing the prosecutor to testify, in admitting evidence without establishing a chain of custody, in instructing the jury, and in refusing to admit evidence offered by appellants. Also, Roy Martin urges that the evidence is insufficient to show he was a party to the alleged offense. We will affirm the judgment against each appellant.

Appellant Roy Martin was convicted of promoting and possessing with the intent to promote, knowing its content and character, the obscene videotape entitled AA Transvestite=s First Blow Job.@ Appellant Rachel Martin was convicted of promoting and possessing with the intent to promote, knowing its content and character, the obscene videotape, AOriental Action.@ Appellant Melissa Mayo was convicted of promoting and possessing with the intent to promote, knowing its content and character, the obscene videotape entitled ABi-Nanza.@ Appellant James Mayberry was convicted of promoting and possessing with intent to promote, knowing its content and character, the obscene videotape entitled ABlack Pepper.@

A person commits an offense if, knowing its content and character, he promotes or possesses with intent to promote any obscene material. *See* Tex. Pen. Code Ann. ' 43.23(c)(1)

2

(West 1994).  APromote@ means to issue, sell, give, provide, deliver, transfer, distribute, or to offer or

agree to do the same.  *See id.* ' 43.21(a)(5).

Obscene is statutorily defined.

(1)  AObscene@ means material or a performance that:

(A)  the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;

(B)  depicts or describes:

(i)  patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

(ii)  patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs; and

(C)  taken as a whole, lacks serious literary, artistic, political, and scientific value.

*Id*. ' 43.21(a).  AMaterial@ means anything tangible that is capable of being used or adapted to arouse

interest, whether through the medium of reading, observation, sound, or any other manner.  *See id*.

' 43.21(a)(2).  APatently offensive@ means so offensive on its face as to affront current community standards

of decency.  *Id*. ' 43.21(a)(4).

In their seventh point of error, appellants urge that no rational jury could have found

obscene the videotapes they were charged with promoting.  An appellate court is required to conduct an

independent review of the alleged obscene material to determine whether it is obscene. *Miller v. California*, 413 U.S. 15, 25 (1973). Obscenity cases are one of the rare instances in which an appellate court is constitutionally required to sit as a thirteenth (or in this a misdemeanor case, a seventh) juror. *See Davis v. State*, 658 S.W.2d 572, 581-82 (Tex. Crim. App. 1983). Appellants argue that the videotapes in this case are neither patently offensive, nor do they appeal to a prurientC that is, sick, morbid, or shamefulC interest in sex. *See Brockett v. Spokane Arcades*, 472 U.S. 491 (1985). Appellants urge that these videotapes are simply Aplain vanilla porno@ tapes appealing to a normal, healthy interest in sex. In applying the required statewide standard, appellants contend such images would not offend the average person in the state of Texas, nor would an average person find such images sick, morbid, or shameful. *See* Tex. Pen. Code Ann. ' 43.21(a)(1) (West 1994); *Berg v. State*, 599 S.W.2d 802, 806 (Tex. Crim. App. 1980). Having viewed each of the videotapes, we disagree with appellants and find that each of the videotapes is obscene.

The videotape entitled AA Transvestite=s First Blow Job@ shows images including bondage and sado-masochistic activities. A transsexual individual instructs a young Asian transvestite to manually and orally stimulate a bound male until he ejaculates.[1]

---

[1] The affidavit supporting the arrest warrant for the arrest of Roy Martin, and an affidavit for a search warrant accurately describe the videotape as follows:

> A TRANSVESTITE=S FIRST BLOW JOB, running time with pre-movie promotional segment, approximately 54 minutes.
>
> The first 2 minutes of the film is devoted to an advertisement for 1-800-291-9447 (WHIP) and shows scenes of bondage and sado-masochistic activities. Included in this segment is a scene in which a woman is shown attaching a large

hemostat-like device to the labia of another woman where several other of the devices have already been attached.

The actual feature runs approximately 48 minutes. It begins with a trans-sexual bringing a young Asian male into a residence. The trans-sexual assists the Asian male in cross-dressing in female lingerie and applying make-up and wig. Another male is caught in the residence and bound and hooded by the trans-sexual. The trans-sexual proceeds to spank the male with hands, riding crop, etc. The Asian male, now completely dressed as a woman, enters and the trans-sexual alternates spanking the bound male and the Asian. At one point the Asian male ties a rope around the bound male=s genitalia. The remainder of the feature, approximately 18 & 2 minutes is devoted to the Asian male, under the direction of the trans-sexual, manually and orally stimulating the bound male until, during manual stimulation, the bound male ejaculates.

*5*

The videotape entitled AOriental Action@ shows images including male-female genital sex, fellation, cunnilingus, anal sex, male ejaculation, and group scenes of the same activities.[2]

---

[2] The affidavit supporting the arrest warrant for the arrest of Rachel Martin and the affidavit for a search warrant accurately describe the videotape as follows:

ORIENTAL ACTION VOL. 2, running time approximately 60 minutes.

One male/one female showed genital sex twice, fellation 3 times, cunnilingus 3 times, anal sex 3 times, manual/digital stimulation of the genitals and/or anus 7 times, a device to stimulate the genitals and/or anus once or more means of stimulating the genitals and/or anus in combination 3 times and a male ejaculation once.

2 females, cunnilingus once, manual/digital stimulation of the genitals twice and cunnilingus in combination with manual/digital stimulation of the genitals once.

Group scenes included 10 instances of genital sex, fellation 27 times,

6

cunnilingus 6 times, anilingus once, manual/digital stimulation of the genitals/anus 12 times and two or more means of genital and/or anal stimulation 19 times, including fellatio/fellatio/cunnilingus, anilingus and digital stimulation of the genitals and genital sex combined with fellatio, among others. A male was shown ejaculating 6 times.

The videotape entitled ABi-Nanza@shows similar images in a ranch setting, including fellatio, cunnilingus, anilingus, anal sex, male ejaculation, and simultaneous combinations of these acts involving several participants.[3]

The videotape entitled ABlack Pepper@ shows images of mixed races engaging in fellation, cunnilingus, anilingus, anal sex, and combinations of these acts performed simultaneously in groups.[4]

---

[3] The affidavit supporting the arrest warrant for the arrest of Melissa Mayo and an affidavit for a search warrant accurately describe this videotape as follows:

> Your affiant subsequently watched the movie and found the following: scenes involving two males showed fellatio 3 times, anal sex twice, manual/digital stimulation of the genitals and/or anus 3 times and ejaculation twice; scenes between one male and one female displayed 3 instances of genital sex, fellatio 2 times, cunnilingus once, manual/digital stimulation of the genitals and/or anus 3 times, some combination of these acts 10 times including but not limited to, genital sex combined with manual/digital stimulation of the genitals and/or anus and fellatio and cunnilingus combined with manual/digital stimulation of the genitals and/or anus. There was one instance of male ejaculation. Scenes involving 3 or more participants showed genital sex 3 times, fellatio 5 times, 3 instances of cunnilingus, manual/digital stimulation 6 times, 4 instances of multiple sexual activities such as, but not limited to, males simultaneously performing fellatio on each other and fellatio and cunnilingus performed simultaneously, etc. There were 2 instances of male ejaculation.

[4] The affidavit supporting the arrest warrant issued for the arrest of James Mayberry and an affidavit for a search warrant accurately describe this videotape as follows:

> BLACK PEPPER, VOL. 15 ran for approximately 1 hour and 59 minutes. This included promotional video for phone sex services which included graphic sexual activity, descriptions of which are included in the following.
>
> One male/one female scenes showed genital sex 22 times, fellatio 14 times, cunnilingus 5 times, anilingus once, anal sex 3 times, manual/digital stimulation of the genitals and/or anus 7 times, stimulation of the male genitalia with the breasts once and 7 instances in which two or more means of stimulating the genitals

and/or anus were used simultaneously.  A male ejaculating was shown 6 times.

One scene was devoted solely to a lone female masturbating, manually/digitally.

Scenes between 2 females showed genital sex once, cunnilingus 18 times, manual/digital stimulation of the genitals and/or anus 15 times, stimulation of the genitals and/or anus 7 times and two or more means of stimulating the anus and/or genitals were shown 4 times.  These included manual/digital stimulation of the anus combined with manual/digital stimulation of the genitals and cunnilingus, among other combinations.

Group scenes included genital sex 4 times, fellatio 5 times, cunnilingus twice, manual/digital stimulation twice, and two or more means of genital and/or anal stimulation in combination 14 times.  This included, among others, fellatio combined with cunnilingus and manual/digital stimulation and genital and anal sex in combination.  There were two instances showing a male ejaculating.

**9**

These videotapes promoted by appellants depict patently offensive representations of perverted sexual acts, lewd exhibitions of the male and female genitals in a state of stimulation and arousal that would appeal to a prurient interest in sex; the videotapes taken as a whole have no serious literary, artistic, political, or scientific value; applying a contemporary statewide community standard, we hold that these videotapes are obscene. The jury made a rational finding that the videotapes were obscene. Appellants= seventh point of error is overruled.

In their first point of error, appellants assert that the trial court Aerred in refusing to strike or reform the jury panel, after the court found that the defendant had met the initial burden under *Batson* of demonstrating that the State had disproportionately used its peremptory strikes against African-American veniremen, and the State offered pretextually race-neutral reasons for the exercise of those strikes.@

At the close of jury voir dire, and after the parties made their peremptory strikes, but before the jury selected was sworn and before the panel was released, appellants moved the trial court to strike or reform the jury pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), and the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 35.261 (West 1989). Appellants insisted that the State had made race-based peremptory strikes. Appellants, not being of the same race as the prospective jurors who were peremptorily challenged, asserted a Athird party@ equal protection claim on behalf of the African-Americans who had been excluded from service on the jury. *See Powers v. Ohio*, 499 U.S. 400 (1991). The court then conducted a *Batson* hearing.

A *Batson* challenge should be determined in a three-step process. *See Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). In the first step, the opponent of the peremptory challenge must make a

**10**

prima facie case of racial discrimination. *Id*. In the second step, the burden shifts to the proponent of the challenge to come forward with a race-neutral explanation; this step does not demand an explanation that is persuasive, or even plausible; at this step of the inquiry, the issue is facial validity of the prosecutor=s explanation; unless a discriminatory intent is inherent in the prosecutor=s explanation, the reason will be deemed race-neutral. *Id*. In the third step, if a race-neutral explanation has been tendered, the trial court must then decide whether the opponent of the challenge has proved purposeful discrimination; it is not until the third step that the persuasiveness of the justification for the challenge becomes relevant; this is the step in which the trial court determines whether the opponent of the challenge has carried the burden of proving purposeful discrimination. *Id*.

Here, it is uncontroverted that no African-American served on the jury. The State exercised peremptory challenges excluding four African-Americans from service on the jury. A showing that all four African-Americans who were in the strike zone were challenged by the State made a prima facie showing of racial discrimination. The State offered explanations for the strikes it had exercised.

Without obtaining the court=s ruling on the second step of the process, appellant, apparently believing the State had stated race-neutral reasons for their strikes, immediately entered into the third step of the process. Appellant cross-examined the prosecutor attempting to show that the State=s explanations for its strikes against the four African-American panel members were pretextual and not truly race-neutral.

When the cross-examination of the prosecutor ended, appellants= counsel made a brief argument and the trial court ruled that Athe State provided race-neutral explanations for its strikes, and we will proceed with the jury selected.@ Implicit in the court=s ruling was a finding that appellants had not

**11**

persuaded the court that the State=s reasons were pretextual. Appellants made no other objections at that time. The jury was sworn, the remaining members of the panel were discharged, and the trial commenced.

Initially, appellants complain that, A[b]ecause the trial court in this case never made a finding as to the plausibility of the reasons proffered by the State, ruling instead that the reasons were >race-neutral,= the *Batson* inquiry at the trial court level was never completed.@ Appellants argue that this Aleaves this Court with two options: (1) remand the case to the trial court for an ultimate finding on the third step of the *Batson* inquiry, or (2) make its own finding from the record whether the State met its burden of rebutting appellants= prima facia case of racial discrimination in the exercise of its perempteries.@ Appellants argue that Aif, as here, a court collapses the second and third step, that is reason enough to reverse the case, as the United States Supreme Court did in *Purkett*.@ However, the circumstances were different in *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995), than the circumstances in this case.

In *Purkett v. Elem*, the Eighth Circuit Court of Appeals held that in the second step of the *Batson* hearing, the prosecutor must not only give race-neutral reasons for its strikes but also that such reasons should be at least minimally persuasive. *Elem*, 514 U.S. at 768. The Supreme Court reversed the Eighth Circuit holding that the Eighth Circuit had misplaced the burden of persuasion. The Supreme Court ruled that in the second step of the *Batson* hearing, the prosecutor=s reasons for peremptorily striking a prospective juror need not be persuasive and might be even Aimplausible or fantastic.@ *Id*. Here, the trial court=s ruling was that appellant had failed to persuade the court that the State=s explanations for its strikes were not race-neutral.

We must let stand the trial court=s ruling at the conclusion of the *Batson* hearing unless it was clearly erroneous. *See Hernandez v. New York*, 500 U.S. 352, 365-66 (1991); *Pondexter v. State*, 942 S.W.2d 577, 581 (Tex. Crim. App. 1996); *Rhoades v. State*, 934 S.W.2d 113, 123 (Tex. Crim. App. 1996); *Tennard v. State*, 802 S.W.2d 678 (Tex. Crim. App. 1990). The four appellants tried jointly were entitled to a total of twelve peremptory strikes and the State was entitled to twelve peremptory strikes. *See* Tex. Code Crim. Proc. Ann. art. 35.15(c) (West 1989). The four African-American panel members on whom the State used peremptory strikes were panel members one, nineteen, twenty-two, and twenty-seven. Originally, there were forty panel members but several, including one African-American, were challenged for cause.

The prosecutor testified that he struck panel member nineteen and another panel member who was not African-American because they were both army retirees. The prosecutor explained that in his experience he had found that retired military people were more liberal than other members of society. The prosecutor implied that he did not want liberal people on this jury. On appeal, appellants do not seriously question the prosecutor=s challenge of panel member nineteen. The prosecutor explained that he exercised a peremptory strike against panel member twenty-seven because he had twice been convicted of driving while intoxicated. The prosecutor also explained that he used peremptory strikes against three non-African-American panel members because they also had been convicted of driving while intoxicated.

Clearly, the prosecutor=s reasons for peremptorily striking panel members nineteen and twenty-seven were race-neutral. The reasons given for the strikes were legitimate ones and were not shown to be pretextual or sham reasons.

**13**

The prosecutor testified that he exercised a peremptory strike against panel member one because he appeared to be inattentive during both the State=s and defense counsel=s voir dire. AHe was not paying attention at all to the proceedings . . . didn=t even know what I was asking or [what was] going on . . . . He was not even paying attention when the defense counsel was talking to him.@ The prosecutor admitted that another panel member who served on the jury had closed his eyes momentarily during voir dire. This does not necessarily show that the panel member who closed his eyes momentarily was inattentive. The prosecutor gave a race-neutral reason for striking panel member number one. Appellants did not rebut the prosecutor=s explanation for striking juror number one.

The prosecutor testified that he exercised a peremptory strike against panel member twenty-two because when he questioned her on two occasions Ashe was not very responsive . . . . She didn=t seem to care very much about being here . . . . I didn=t feel she would be a good juror.@ Appellants most strenuous complaint is about the strike exercised against panel member twenty-two. On appeal, using the reporter=s record, completed long after trial and long after the trial court=s ruling, appellants make an exhaustive comparative analysis of the State=s use of its peremptory challenges.

Relying on *Young v. State*, 826 S.W.2d 141 (Tex. Crim. App. 1991), appellants argue that AWhile a comparative analysis need not be raised at trial in order to preserve it for appeal, . . . nevertheless in this case, such comparative analysis was raised at trial by the Defense, though not analyzed as thoroughly as it has been here, because the record was not available at that time.@[5]

---

[5] Unfortunately, *Young* has not been overruled. *See Young v. State*, 826 S.W.2d 141 (Tex. Crim. App. 1991) (Campbell, J., dissenting, joined by McCormick, P. J.) (opinion denying State=s motion for rehearing, Benavides, J., dissenting, joined by McCormick, P. J., Campbell, J., and White,

J.). On remand, *Young v. State*, 848 S.W.2d 203 (Tex. App.CDallas 1992, pet. ref=d) (Onion, J., dissenting). *Young v. State*, 856 S.W.2d 175 (Tex. Crim. App. 1993) (opinion refusing State=s petition for discretionary review, Maloney, J., dissenting, joined by McCormick, P. J., and White, J.). These dissents strenuously disagree with allowing the comparative analysis to be made from the record on appeal. As Judge Maloney says, it is Atantamount to a sandbag [of the trial judge] of the greatest magnitude.@ *Young*, 856 S.W.2d at 177.

The prosecutor told the panel that the State=s evidence would include Asome pretty graffic [sic] stuff@ that they might not want to see but that it would be each juror=s duty to watch the videotapes to determine whether the defendants had violated the law. The prosecutor then elicited a response from each panel member individually concerning whether he or she could accept that duty of watching the videotapes if selected as a juror. In their brief, appellants summarize the panel members= responses. Eighteen answered AYes,@ sixteen AYes, sir,@ one AI can,@ one AYes, I can,@ one AUh-huh,@ one ANo,@ and one AHuh-uh.@

Later, after the prosecutor explained to the panel the range of punishment provided for the charged offense, he elicited a response from each panel member individually concerning whether she or he could consider the whole range of punishment if the defendants were found guilty of the charged offense. On appeal, appellants show the panel members= responses: Twenty-two answered AYes,@ twelve AYes, sir,@ one AI could,@ one ASure,@ one AUh-huh, panel member three ANot impartially,@ panel member eleven AI couldn=t consider nothing.@ Panel member twenty-two answered both questions, AYes, sir.@ Continuing their comparative analysis, appellants summarize the remainder of the State=s voir dire as follows:

> Other than in the course of these two questions, the sum total of words spoken by all veniremembers during the prosecutor=s entire voir dire was 113 words. There were 12 one-word sentences, 4 two-word sentences, 2 three-word sentences, 3 four-word sentences, 2 five-word sentences, 2 seven-word sentences, 1 eight-word sentence, 2 thirteen-word sentences, and 1 seventeen-word sentence . . . . In other words, not one veniremember volunteered anything regarding the case. Twenty-six of the forty veniremembers, like [panel member twenty-two], remained entirely silent throughout the State=s voir dire except in response to the two questions outlined above. Sixty-seven of the 113 words spoken were uttered by two veniremembers.

Appellants adroitly summarize their argument:

**16**

A review of the record will demonstrate that the disparate treatment of the two veniremen complained of, as compared to the treatment of other, non-African-American veniremen, supports only a finding that the prosecutor=s reasons were a mere pretext for race-based discriminatory exercise of peremptory strikes. Particularly as to [panel member twenty-two], the prosecutor noted that it was not her attitude or other quality not susceptible to transcription that caused him to strike her, but the length of her answers. This is uniquely reviewable on appeal, and may be one of the only circumstances where the appellate court, reviewing the Acold record,@ is in a *better* position than the trial court to weigh its veracity, because the cold record lends itself to counting.

We disagree with appellants= argument that this appellate court is in a better position to determine from a cold record whether the State offered pretextual reasons for peremptorily challenging panel member twenty-two. The trial court observed the demeanor of all of the panel members during voir dire and noted the manner (promptness, delay, voice inflection, attitude, and the like) in which they responded to the prosecutor=s and defense counsel=s questions. The trial court was acquainted with and observed the demeanor of the prosecutor during voir dire and when he testified about his reasons for striking the panel members. In addition to observing the panel members, the best evidence concerning purposeful discrimination will often be the demeanor of the attorney who exercises the challenge. *Hernandez*, 500 U.S. at 364-66. Because the trial court=s finding turns largely on an evaluation of credibility, a reviewing court should ordinarily give these findings great deference. *Id*. A trial court=s finding on the issue of discriminatory intent should not be overturned unless its determination is clearly wrong. *Id.* at 368-69. After reviewing the voir dire, the *Batson* hearing, and the remainder of the record, we find that the trial court=s ruling was not clearly wrong. Appellants= first point of error is overruled.

In their second point of error, appellants insist that the trial court erred in refusing to allow defense counsel to tell the jury Awhat he expected the State=s evidence would not show@ in his opening statement. Immediately after the State=s opening statement, defense counsel addressing the jury said: AGood morning, y=all. Let me tell you what the evidence is not going to show you in this case.@ The prosecutor objected. Defense counsel stated that he was entitled Ato *argue* what the State=s evidence was lacking, what evidence they will be lacking.@ The trial court sustained the State=s objection, telling defense counsel that he could tell the jury Awhat you anticipate your evidence is going to show.@ The Code of Criminal Procedure provides that either after the State=s opening argument or after the testimony of the State=s case-in-chief has been presented, the Anature of the defenses relied upon and the facts expected to be proved in their support shall be stated by defense counsel.@ *See* Tex. Code Crim. Proc. Ann. art. 36.01(a)(5), (b) (West Supp. 2002).

Because the record does not show by bill of exception, either formal or informal, what defense counsel=s opening statement would have been, nothing is presented for review. *See White v. State*, 181 S.W. 192, 193 (Tex. Crim. App. 1916); *McBride v. State,* 7 S.W.2d 1091, 1094 (Tex. Crim. App. 1928). Moreover, the statute does not allow defense counsel to *argue* in his opening statement what he thinks will be lacking in the State=s proof. The proper time to argue the State=s lack of proof is in jury argument after the close of evidence. Defense counsel did make an opening statement concerning the evidence that would be presented in appellant=s defense. Appellants= second point of error is overruled.

In their third point of error, appellants urge that the trial court erred in allowing the

**18**

prosecutor to testify, over objections, to their identity.[6]  The appellant argues, Athe admittedly common

---

[6] Defense counsel objected in a similar manner when each appellant was identified.

| | |
|---|---|
| Q: | Okay.  During this time did another person enter the business? |
| R: | Yes. |
| Q: | And do you know who that person was? |
| R: | I later determined or learned that that was Roy Martin. |
| Q: | Okay.  Is Mr. Martin in the courtroom today? |
| R: | He=s seated to Ms. Martin=s left, in the white shirt. |
| Mr. Danford: | Your Honor, may the record reflect he=s identified Mr. Martin in this case? |

practice of prosecutors asking, in the presence of the jury, that >the record indicate that the witness has identified the Defendant,= is a practice which should be halted by this Court. At its best, it is testimony by the prosecutor; at its worst, it is an invitation - one all too often accepted - for the trial judge to comment on the weight of the evidence.@

However, where a defendant was identified in court merely as the man Awearing an orange shirt and a light beige/tan leisure suit,@ the appellate court admonished prosecutors saying, AWe do urge, however, that prosecutors follow the better practice of using the talismanic words >Let the record reflect . . . .=@ *Rohlfing v. State,* 612 S.W.2d 598, 601-602 n.2 (Tex. Crim. App. 1981). Although appellants= argument is interesting, we hold proper the method of identification used here, and in almost every case before us. If the record does not show that a defendant was identified in court as appellants were here, defendants will contend that they were Anever properly identified in court as the actual perpetrator of the offense.@ *Rohlfing*, 612 S.W.2d at 600. Appellants= third point of error is overruled.

In their fourth point of error, appellants assert that the State failed to establish a proper chain of custody showing that the videotapes admitted in evidence and exhibited to the jury were the same

---

Mr. Fahle:      Object to counsel testifying, Your Honor. The record will speak for itself.

THE COURT:  Overruled. For the record, the witness has identified Mr. Martin.

videotapes purchased from appellants.  On several occasions, James Naramore, an investigator for the Bell County Attorney=s Office, purchased videotapes from appellants, who were employees at the Adult Video store.  Naramore purchased the videotapes with money furnished him by Houston Johnson of the Harker Heights Police Department.  After Naramore purchased the videotapes, he and Johnson individually viewed the videotapes and marked the boxes in which the tapes were purchased.  The boxes and videotapes were left in the custody of the Harker Heights Police Department.  Before trial, about a year later, Naramore again viewed the tapes.  He testified that the videotapes admitted in evidence were the same tapes that he had viewed after they were purchased from appellants.

Appellants complain that the trial court limited their cross-examination of Naramore concerning his Aastonishing[ly] good long time memory@ about the contents of the videotapes. From our review of the record, we are unable to find that the trial court abused its discretion in limiting appellants=cross-examination of Naramore.  There was no evidence that the tapes had been tampered with.  We hold that the videotapes were sufficiently well identified to be admitted in evidence and exhibited to the jury.  Appellants= fourth point of error is overruled.

In their fifth point of error, appellants complain of the trial court=s refusal to admit in evidence Defendants= Exhibit Twenty-nine.  The defense offered the testimony of John Bailey, Ph.D.  Dr. Bailey was a research and clinical psychologist and a professor of psychology at Northwestern University. Dr. Bailey testified that he had been conducting research in human sexuality in a study funded by a grant from the National Institutes of Health.  In this study, Dr. Bailey testified that he used pornographic videotapes as stimuli for the research subjects.  Dr. Bailey had prepared a videotape compilation,

Defendants= Exhibit Twenty-nine, which included pornographic clips used in his research. Appellants contend that this videotape compilation was relevant and admissible before the jury to show that videotapes like those promoted by them, when taken as a whole, had serious scientific value. The record concerning the exclusion of Defense Exhibit Twenty-nine shows:

[Defense Counsel]:  Your honor, we=d move for admission of Defendant=s Exhibit Number 29.

[Prosecutor]:  Renew my objection, Your Honor.

(At the Bench, off the record.)

[Defense Counsel]:  Judge, we would offer this 29 as an offer of proof.

THE COURT: Okay.

The record does not clearly show that the court ruled on the State=s objection and it does not clearly show what the court ruled on appellants= offer of proof.

In order for a complaint concerning the exclusion of evidence to be considered on appeal, the record must contain the excluded evidence; absent a showing of what the evidence is that was excluded, nothing is presented for review. *See Stewart v. State*, 686 S.W.2d 118, 122 (Tex. Crim. App. 1984); *Adams v. State*, 969 S.W.2d 106, 112 (Tex. App.CDallas 1998, no pet.). In order for this Court to consider appellants= point of error, this Court would need to actually see the videotape, Defense Exhibit Twenty-nine. Because appellants did not make Defense Exhibit Twenty-nine a part of the appellate record by a bill of exception, either formal or informal, they have waived their complaint about Defense Exhibit Twenty-nine being excluded from evidence. *See Stewart*, 686 S.W.2d at 122; *Gonzales v. State*, 63

S.W.3d 865, 878 (Tex. App.CHouston [14th Dist.] 2001, no pet.); *Oldham v. State*, 5 S.W.3d 840, 847 (Tex. App.CHouston [14th Dist.] 1999, pet. ref=d). We are unable to review the merits of appellants=point of error. Point of error five is overruled.

In their sixth point of error, appellants complain that the trial court erred in charging the jury that appellants need only know the Acontent *or* character@ of the videotapes they allegedly promoted rather than requiring that appellants know the Acontent *and* character@ of the videotapes. The informations alleged that appellants knew the Acontent and character@ of the videotapes they allegedly promoted. The trial court charged the jury that a person commits the offense of obscenity if, knowing its Acontent and character@ he or she promotes, or possesses with intent to promote, any obscene material. *See* Tex. Pen. Code Ann. ' 43.23(c)(1) (West 1994). However, the application paragraph of the charge only required that the jury find appellants knew the Acontent or character@ of the videotapes. Appellants= objection to the charge on this ground was not made until the middle of defense counsel=s closing jury argument and again after the jury had retired to deliberate; these objections were untimely. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (West Supp. 2002).

Therefore, we must first decide whether the jury charge submitted was erroneous. If the charge was erroneous, because the objections were untimely, we must then decide whether the charge caused egregious harm that deprived appellants of a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). The State is not required to prove that a defendant knew the videotapes were legally obscene. *See Burden v. State*, 55 S.W.3d 608, 614 (Tex. Crim. App. 2001). It

is only required that a defendant have knowledge of the sexually explicit content and character of the material. *Id*.

The words Acontent@ and Acharacter@ are not statutorily defined. AContent@ is defined as something that is contained: the thing, things, or substance in a receptacle or an enclosed space. *Websters Third New International Dictionary* 492 (Philip B. Gove ed., 1961). ACharacter@ is defined as the aggregate of features and traits that form the apparent individual nature of some person or thing. *The Random House Dictionary of the English Language* 247 (unabridged, Jess Stein ed., 1979).

It would only be necessary that the jury find that appellants knew the contents of the videotapes were sexually explicit *or* that the character and nature of the videotapes were sexually explicit. We hold that the trial court did not err in charging the jury in the disjunctive. However, in the alternative, if the trial court erred in its jury charge, from our review of the entire jury charge, the evidence heard by the jury, including the contested issues and the weight of the probative evidence, and the argument of counsel, we conclude that appellants were not egregiously harmed by the charge, if it were erroneous, and that appellants were not deprived of a fair and impartial trial. Appellants= sixth point of error is overruled.

In the eighth point of error, appellant Ray Martin insists that the evidence is insufficient to support his conviction either as a party or as a principal to the offense charged. The jury charge allowed appellant Martin=s conviction if he either acted alone, or as a party, to the offense of promoting an obscene videotape, by encouraging, aiding, or attempting to aid Rachel Martin to promote the obscene videotape, AA Transvestite=s First Blow Job.@

**24**

A person is criminally responsible for an offense committed by the conduct of another if acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *See* Tex. Pen. Code Ann. ' 7.02(a)(2) (West 1994). Appellant argues that he was merely present at the scene of the offense and therefore he is not guilty of committing the offense of which he has been convicted.

The first time Naramore entered the Adult Video store to purchase videotapes, he selected four tapes; one of the tapes was AA Transvestite=s First Blow Job.@ Naramore brought the four tapes to the counter and discussed his purchase with Rachel Martin, the only employee in the store at that time. Rachel Martin assured Naramore that, as marked on the boxes, the tapes were XXX rated. During Naramore=s conversation with Rachel Martin, Roy Martin entered the store and joined the conversation. Rachel Martin then went some other place in the store. Roy Martin walked behind the counter near the cash register. Roy Martin looked at the boxes containing the videotapes and on a piece of paper totalled the sale price of the tapes. Roy Martin told Naramore the amount of the purchase price, but said he was not on duty that day and that Rachel Martin would have to actually ring up the sale. Rachel Martin returned to the counter and Roy Martin told her he had Atallied up the sale.@ Rachel Martin Arefigured it, and came up with the same total amount.@ Naramore paid Rachel Martin for the tapes and left the store.

This evidence is sufficient to support the jury=s finding and verdict that appellant Roy Martin was guilty of the offense charged, either as a principal actor or, as a party to the offense by aiding or attempting to aid Rachel Martin in promoting the obscene videotape, A Transvestite=s First Blow Job. The eighth point of error is overruled.

25

The judgments are affirmed.

_____

Carl E. F. Dally, Justice

Before Justices Kidd, Yeakel and Dally [*]

Affirmed

Filed:   November 7, 2002

Do Not Publish

[*]   Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment.  *See* Tex. Govt. Code Ann. ' 74.003(b) (West 1998).