Opinion issued October 11, 2007









Opinion issued October 11, 2007










 

 

 

 




 

 

 

















 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-06-00717-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



IN THE INTEREST OF J.A.G., Appellant

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



On Appeal from Cause No. JV-04-55

In the County Court at Law, Walker County, Texas

 

 



 MEMORANDUM OPINION

 

Following a bench trial, the trial
court adjudicated J.A.G. as having engaged in delinquent conduct by committing
aggravated sexual assault of a disabled individual, and committed J.A.G. to the
custody of the Texas Youth Commission for a determinate period of ten years.  See
Tex. Pen. Code Ann. § 22.021
(Vernon Supp. 2006); Tex. Fam. Code Ann.
§ 51.03 (Vernon Supp. 2006).  On appeal, J.A.G. asserts that (1) the evidence
was legally and factually insufficient to support the adjudication of
delinquency, (2) the trial court abused its discretion in excluding the results
of a polygraph examination proffered in his defense, (3) the trial court
violated J.A.G.’s constitutional right to due process by refusing to hear evidence
of prosecutorial misconduct, (4) the trial court erred in considering an
incompetent report addressing dispositional alternatives, and (5) J.A.G.
received ineffective assistance of counsel at trial, all of which require
reversal of his conviction.  Finding no error, we affirm.

Background

J.A.G. first met A.K.D. when he was
about three years old and she was approximately four.  They became cousins when
A.K.D.’s father married her stepmother, who is also the sister of J.A.G.’s father. 
For much of their lives, J.A.G. and A.K.D. lived next door to each other on
property owned by their grandparents.  A.K.D.’s family lived in a mobile home,
and J.A.G. lived with his parents in a house that stood approximately 400 feet
away.  Their parents took turns carpooling them to school, and the families
spent quite a bit of time together.  A.K.D. also spent time with J.A.G. at
school, sometimes eating lunch with him in the cafeteria.  




A.K.D. has mental retardation and suffers
from seizures and dystonia.  Dystonia is a neurological disorder that impairs
the ability to control movement.  The dystonia causes A.K.D. to have difficulty
controlling the movements of her tongue, mouth, arms and legs.  Dr. Robert
Zeller, a pediatric neurologist with forty years of experience, and A.K.D.’s
treating physician from 1995 until 2005, stated that A.K.D. developed dystonia
in approximately 2000.  As A.K.D.’s father testified, dystonia is a progressive
disorder associated with A.K.D.’s mental retardation.  

Normal activities and communication
are challenges for A.K.D.  Even with effort, her speech is very garbled.  Dr.
Zeller explained that A.K.D. had “difficulty controlling her movements of her
tongue and mouth and her arms and legs,” which impaired her ability to walk and
talk.  A.K.D.’s high school special education teacher, Judith Walker, testified
that she considered A.K.D. to be a “nonverbal” student, by which she meant that
A.K.D. “cannot talk like, you know, like have a conversation like we’re doing
right now.  It’s—she can kind of say certain things, but you have to ask a
bunch of questions before you can get to, you know, whatever she’s trying to
say to you.”  

Because of A.K.D.’s impairment, Dr.
Zeller testified, she would not be able to protect herself from harm or be able
to speak or scream if she were frightened.  Dr. Zeller also opined that A.K.D.
was “mentally slow” and was physically and mentally incapable of caring for
herself.  While admitting that he was not a psychologist and had not studied
A.K.D.’s mental abilities in depth, Dr. Zeller testified that, based on his
experience and his observation of A.K.D. over a ten-year period as her treating
neurologist, he considered A.K.D. to be mentally incapable of appraising the
nature of sexual activity.  

A.K.D.’s father testified that A.K.D.
was first diagnosed with mental retardation shortly after age three, when she
was enrolled in a special school for the learning disabled.  A.K.D. attended
special education classes from first grade through her high school graduation. 
A.K.D.’s father did not know the exact extent of her disability, but recalled
that I.Q. testing administered when A.K.D. was in seventh grade placed her at
about the I.Q. level of a third-grader.  A.K.D.’s father explained that,
because of A.K.D.’s difficulty in controlling movement, it took her nearly an
hour to shower and another hour and a half to dress herself.  He also noted
that A.K.D. had difficulty opening the front door to the family’s mobile home. 
A.K.D. also occasionally loses bowel and bladder control, and her stepmother
keeps track of her menstrual cycle because A.K.D. is unable to do so.  




Late one Saturday night in October
2004, J.A.G. crept into the mobile home, entered A.K.D.’s room, awoke her, took
off her pajama pants and underwear, and made penile penetration with A.K.D.’s
vagina and anus.  A.K.D.’s father testified that A.K.D. tried to tell him about
the encounter the next morning.  He said that she had a hard time expressing
herself due to her disabilities and that he dismissed her because he understood
that J.A.G. was at his sister’s house in Conroe at the time.  Later that day,
however, A.K.D.’s parents noted that J.A.G.’s car was in the driveway of his
home and went to speak with J.A.G. about the incident.  J.A.G. denied having
been in A.K.D.’s room.  

A.K.D.’s family also celebrated her
eighteenth birthday with a barbecue dinner the Sunday following the incident. 
Family members, including J.A.G. and his parents, attended.  A.K.D.’s
step-grandmother, who is also J.A.G.’s grandmother, testified that she saw
A.K.D. seated at the kitchen table with J.A.G and did not perceive anything
different about A.K.D.’s behavior that day.  A.K.D.’s father, however, recalled
that A.K.D. retreated to her room for most of the party, which is something
that she does when she is upset.  

When she returned to school on
Monday, A.K.D.’s special education teacher, Judith Walker, asked A.K.D. about
her birthday party.  In response, A.K.D. told her that during the weekend, a
boy had entered her room in the middle of the night and that she didn’t get any
sleep.  When Walker asked A.K.D. what the boy was doing in her room, A.K.D.
began to cry.  After much questioning by Walker, A.K.D. told Walker that the
boy, whom she identified as J.A.G., had touched her in her vaginal, anal, and
breast areas.  According to Walker, A.K.D.’s demeanor during their discussion
was normal at first, but A.K.D. became very upset when Walker began to question
her about what the boy did to her.  

When Walker realized that A.K.D. was
describing a sexual assault, she brought her to the school counselor and
contacted A.K.D.’s parents, who brought A.K.D. to the hospital emergency room. 
There, A.K.D. was seen by a physician and nurse Elizabeth Windham, who
administered a rape kit.  Nurse Windham testified that A.K.D. was very upset
and that she had a hard time taking a statement from A.K.D. because she was
crying very hard.  She also stated that she noticed A.K.D. “[h]ad some very
obvious developmental delays.”[1] 

With some difficulty, Nurse Windham followed
the rape kit protocol and obtained evidence and a statement from A.K.D. 
According to A.K.D.’s statement, as recorded in A.K.D.’s own words by Windham, J.A.G. went into A.K.D.’s room, woke her up, took off her night shorts and
panties, put his penis in her “tee tee” and in her “back part,” then in the
“front part” again, and left.  Pelvic examination revealed a small tear at the
vaginal opening.    

Discussion

A.      Appellate Jurisdiction

          1.       Timeliness of J.A.G.’s Appeal

As a threshold matter, we address the
State’s challenge to our jurisdiction over this appeal, specifically, the
assertion that J.A.G. did not timely move for new trial and, consequently, did
not timely notice his appeal.  As the State notes, a motion for new trial was
filed on J.A.G.’s behalf by new counsel within the thirty days following the
dispositional order, but, implying that the motion was not effective when
filed, the State claims that it was untimely because the trial court did not
sign the order substituting new counsel until after the thirty-day deadline. 
We reject the notion that actions previously undertaken by new counsel in
furtherance of a client’s interest are invalid if they occur before the court
signs an order of substitution.  Cf. Austin Nursing Ctr., Inc. v.
Lovato, 171 S.W.3d 845, 852 (Tex. 2005) (holding that plaintiff had
capacity to sue as estate’s personal representative as of date suit was filed
even though she was not appointed personal representative until after
limitations had run because appointment within reasonable time related back to
timely filing of suit); Lorentz v. Dunn, 171 S.W.3d 854, 856 (Tex. 2005)
(same).  The State points to the rule that trial counsel presumptively
continues to represent a defendant if counsel does not move to withdraw or for
substitution, but fails to note that the presumption is rebuttable. Oldham
v. State, 977 S.W.2d 354, 363 (Tex. Crim. App. 1998); Benson v. State,
224 S.W.3d 485, 491 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (en banc). 
If, as these cases observe, a defendant is entitled to appear pro se during the
post-disposition period, nothing precludes new counsel from appearing for him. 
To conclude otherwise would conflict with the Supreme Court’s directive that we
construe the appellate rules “reasonably, yet liberally, so that the right to
appeal is not lost by imposing requirements not absolutely necessary to effect
the purpose of a rule.”  Verburgt v. Dorner, 959 S.W.2d 615, 616–17 (Tex. 1997).  Accordingly, we hold that the motion for new trial was effective when timely
filed and, therefore, the notice of appeal was also timely filed, supplying the
jurisdictional basis to review the merits of this appeal.

2.       Perfection of appeal

The State also contends that the
appeal was not perfected because neither security for costs nor an affidavit of
inability to pay the costs of appeal appears in the record.  At the same time,
the State notes, the docket sheet in the clerk’s record lists an affidavit of
inability to pay costs.  The State appears to have neither attempted to
ascertain whether this affidavit exists or, if it does, to supplement the
appellate record with a copy of it.  Based on the listing in the clerk’s record
and the fact that a reporter’s record has been prepared and filed, and absent
any showing to the contrary, we presume that proper procedures have been
followed to secure the appellate record, and proceed to address the merits of
J.A.G.’s appeal.  

B.      Sufficiency of the evidence

J.A.G. does not dispute that the
sexual contact that A.K.D. described occurred.  He contends that the trial
court’s adjudication of delinquency by reason of aggravated assault of a
disabled individual should be reversed because the evidence was legally and
factually insufficient to support a finding that A.K.D. was a “disabled
individual” for purposes of the statute.  Specifically, J.A.G. challenges the
legal sufficiency of the evidence concerning A.K.D.’s mental capacity, her
ability to consent and to resist, and her knowledge of sex.  See Rider v.
State, 735 S.W.2d 291, 292–93 (Tex. App.—Dallas 1987, no pet.).  He also
claims that the evidence was factually insufficient for the same reason. 




1.       Applicable Standards of
Review

In a juvenile
proceeding, the trial court must conduct an adjudication
hearing for the trier of fact to determine whether the juvenile
engaged in delinquent conduct. Tex. Fam.
Code Ann.  § 54.03 (Vernon Supp. 2007).  If the trier of fact determines
that the juvenile engaged in delinquent conduct, the trial
court must then conduct a disposition hearing. Tex. Fam. Code Ann. § 54.03(h), § 54.04 (Vernon Supp. 2006). 
Here, J.A.G. waived his right to trial by jury, placing the trial court in the
role of trier of fact.   

Juvenile cases are civil proceedings, but are
considered “quasi-criminal” in nature.  In re M.A.F., 966 S.W.2d 448,
450 (Tex. 1998); In re K.H., 169 S.W.3d 459, 461-62 (Tex. App.—Texarkana
2005, no pet.). Civil and criminal rules apply at different stages of the same
proceeding.  In re K.H., 169 S.W.3d at 462; see Tex. Fam.
Code Ann. § 51.17 (Vernon Supp. 2006).  The trier of fact adjudicates a juvenile as delinquent only if it
finds beyond a reasonable doubt that the juvenile committed the offense
charged.  Tex. Fam. Code Ann. § 54.03(f).  Thus, we review the sufficiency of the evidence to support
a finding that a juvenile engaged in delinquent conduct using
the same standards applicable to criminal cases.  In re K.H., 169 S.W.3d
at 462; In re G.A.T., 16 S.W.3d 818, 828 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

When conducting a legal sufficiency
review, we view the evidence in the light most favorable to the verdict and
determine whether any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Drichas v. State, 175
S.W.3d 795, 798 (Tex. Crim. App. 2005).  We do not resolve any conflict of
fact, weigh any evidence, or evaluate the credibility of any witnesses, as this
is the function of the trier of fact.  See Dewberry v. State, 4 S.W.3d
735, 740 (Tex. Crim. App. 1999); Adelman v. State, 828 S.W.2d 418, 421
(Tex. Crim. App. 1992); Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim.
App. 1991).  Instead, we determine whether both the explicit and implicit
findings of the trier of fact are rational by viewing all the evidence admitted
at trial in the light most favorable to the adjudication.  Adelman, 828
S.W.2d at 422.  In so doing, we resolve any inconsistencies in the evidence in
favor of the adjudication.  Matson, 819 S.W.2d at 843.  

          When conducting a factual
sufficiency review, we view all of the evidence in a neutral light.  We will
set the verdict aside only if (1) the evidence is so weak that the adjudication
is clearly wrong and manifestly unjust or (2) the findings are against the
great weight and preponderance of the evidence.  See Johnson v. State,
23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  Under the first prong of Johnson,
we cannot conclude that an adjudication of delinquency is “clearly wrong” or
“manifestly unjust” simply because, on the quantum of evidence admitted, we disagree
with the trial court’s findings.  Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006).  Under the second prong of Johnson, we cannot declare that a
conflict in the evidence justifies a new trial simply because we disagree with
the factfinder’s resolution of that conflict.  Id.  Before determining
that evidence is factually insufficient to support an adjudication under the
second prong of Johnson, we must conclude, with some objective basis in
the record, that the great weight and preponderance of the evidence contradicts
the finding made by the trier of fact.  Id.  In conducting a factual
sufficiency review, we must also discuss the evidence which, according to the
appellant, most undermines that finding.  See Sims v. State, 99 S.W. 3d
600, 603 (Tex. Crim. App. 2003). 

2.       Aggravated sexual assault
of a disabled individual

J.A.G. was adjudicated delinquent
under section 22.021 of the Texas Penal Code, which provides that a person
commits aggravated sexual assault if the person intentionally or knowingly
causes the penetration of the anus or sexual organ of another person by any
means, without that person’s consent, 




and the victim is a disabled
individual.  Tex. Pen. Code Ann.
§ 22.021 (Vernon 2006).   

                “‘Disabled individual’ means a person
older than 14 years of age who by reason of age or physical or mental disease,
defect, or injury is substantially unable to protect himself from harm or to
provide food, shelter, or medical care for himself.”  Id. § 22.04(c)(3);
see id. § 22.021(b)(2).  The Penal Code also creates an
irrebuttable presumption that the complainant did not consent when either 

·       
the complainant
does not give actual consent and the defendant knows the complainant is physically
unable to resist, or 

·       
the defendant
knows that as a result of mental impairment the complainant is at the time of
the sexual assault incapable either of appraising the nature of the act or of
resisting it.   

Id. § 22.011(b)(3), (4).  Appellate courts examine evidence of both cognitive and physical elements
in determining whether it is sufficient to show a lack of effective consent due
to mental impairment, focusing on the complainant’s ability to appraise the
nature of the sexual act or the ability to resist it.  Rider, 735 S.W.2d
at 292; Martinez v. State, 634 S.W.2d 929, 934 (Tex. App.—San Antonio
1982, pet. ref’d). 




3.       Sufficiency of evidence
that A.K.D. could not effectively consent

The testimony of A.K.D.’s physician,
her teacher, her parents, and the emergency room nurse uniformly indicates that
A.K.D.’s mental impairment is longstanding and readily apparent to anyone who
interacts with her.  She has been specially educated since age three.  The
adjudication of delinquency based on aggravated assault of a disabled person
also finds support in the trial court’s opportunity to observe A.K.D. during
her testimony, which reflects her mental disability.  For example, she testified
that her age was sixteen, although other witnesses, including her parents, stated
that she is nineteen.  She answered “yes” or “no” to questions when that
response was inappropriate, and would sometimes give conflicting answers when
asked the same question twice.  A.K.D.’s laughter at the doll she used to show
the court where J.A.G. had touched her, which J.A.G. views as showing that she
did not take the trial seriously, is more reasonably viewed in the context of
all the evidence as showing that she did not have the mental capacity to
understand the purpose of the trial and her testimony.  

The trial court, as factfinder, could
also properly consider her use of childlike terms to the emergency room nurse
in describing the incident as evidence of mental impairment.  See Wootton v.
State, 799 S.W.2d 499, 501–02 (Tex. App.—Corpus Christi 1991, pet. ref’d)
(jury finding that complainants were mentally disabled supported in part by
opportunity to observe complainants on the witness stand, where they described
in childlike language that appellant had sex with them).  

In asserting that A.K.D. was able to
appraise the nature of the sexual act, J.A.G. points to evidence that A.K.D.
wrote him notes, wanted to sit next to him in the car on the way to school, and
appeared to flirt with him, as well as testimony from A.K.D.’s father that
A.K.D. could express preferences for certain food and clothing and once told
him that she liked a boy she met at epilepsy camp the previous summer, as well
as her stepmother’s testimony that she had indicated her affection for J.A.G. and
other boys and that she had crushes on some boys.[2]
 This conduct, however, is no more reflective of an understanding of the nature
of the sexual act than similar behavior frequently seen in preschoolers.  See
also Green v. State, No. 14-06-00535-CR, 2007 WL
2265787, *3 (Tex. App.—Houston [14th Dist.] Aug. 9, 2007, no pet. h.)
(mem. op.) (concluding that jury, in finding that victim was mentally disabled,
could have determined that victim’s use of coarse language and opinions
regarding sexuality were product of mimicking behavior rather than indication
he could appraise nature of sexual act).

Furthermore, the notes written by
A.K.D. to J.A.G., some of which are in evidence, weigh in favor of the trial
court’s finding, not against it; they indicate that A.K.D. is unable to
construct a simple sentence.  The testimony concerning A.K.D.’s discussion with
her special education teacher also supports a reasonable inference that A.K.D.
did not fully understand what had happened but felt anxious and upset about it.

          The evidence also supports the conclusion that J.A.G. would have known about A.K.D.’s obvious mental and physical impairments, as he had known her nearly all of his life, lived near her, and spent a significant amount of time with her.  Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court’s adjudication of delinquency for aggravated sexual assault of a disabled person based on J.A.G.’s knowledge that A.K.D. was a mentally impaired person who was “substantially unable to protect [her]self from harm or to provide food, shelter, or medical care for [her]self.”  See Tex. Pen. Code Ann. § 22.04(b)(3) (Vernon Supp. 2006).

4.       Sufficiency of evidence
that A.K.D. did not actually consent

J.A.G. also challenges the legal and
factual sufficiency of the evidence that A.K.D. did not actually consent to the
encounter.  Because the evidence is legally and factually sufficient to support
a finding that A.K.D. could not effectively consent because of her mental
impairment, which was known to J.A.G., whether she actually consented is
immaterial.  Even so, the record contains ample evidence to support findings
that A.K.D. did not invite or consent to J.A.G.’s assault and that her physical
limitations impaired her ability to resist the assault.

          J.A.G. asserts that,
because there was no evidence as to what had caused the vaginal tear and no
evidence of any physical sign that A.K.D. had been involved in a struggle,
there was insufficient evidence that she did not actually consent to the
encounter.  This assertion is not borne out by the record.  A.K.D. testified
that J.A.G. hurt her vagina and anus.  Her testimony also indicates that J.A.G.
initiated and was the aggressor during the incident.  In light of A.K.D.’s
apparent mental and physical deficiencies, the trier of fact could reasonably construe
this testimony as proof that A.K.D. did not consent to the sexual encounter.  

          J.A.G. also suggests that A.K.D.’s
failure to mention any opposition or describe any effort to resist J.A.G.’s
sexual advances undermines any finding that she did not actually consent to his
conduct.  J.A.G. neglects to mention, however, that when the prosecution
questioned A.K.D. about whether she wanted J.A.G. to have sex with her, A.K.D.
answered “no.”  Furthermore, A.K.D. testified that she did not like the
defendant and that J.A.G. hurt her when he came into her room.  

Moreover, what A.K.D. might not have
said about the encounter is not evidence in J.A.G.’s favor.  The fact that
A.K.D.’s speech is extremely limited is apparent from reviewing the record.  She
was frequently reminded to answer verbally as best she could rather than rely
on nonverbal signals, and the trial court and counsel engaged in discussions
concerning the difficulty in hearing her well enough and understanding her
testimony.  When A.K.D. did respond verbally, the brevity of those answers, the
court’s many requests that A.K.D. repeat herself and the repetition of her
answers by the attorneys asking her to confirm what she said show that she has
tremendous difficulty speaking and is extremely difficult to understand, even
though she had recently begun taking a new muscle relaxant medication that
markedly improved her ability to speak and move.  In this case, the trial
court, sitting as the trier of fact, had the opportunity to observe A.K.D. and
hear her testimony.  After observing A.K.D. in the courtroom and hearing
evidence about the effects of her dystonia, the trial court could reasonably have
concluded that A.K.D. did not consent to the conduct and was not capable of effectively
resisting J.A.G.  

C.      Exclusion of polygraph results

J.A.G. contends that the trial court
abused its discretion in excluding testimony relating to the results of a
polygraph examination administered to him.  The existence and results of a
polygraph examination are inadmissible in a criminal proceeding for all
purposes on proper objection. Tennard v. State, 802 S.W.2d 678, 683
(Tex. Crim. App. 1990).   The reporter’s record indicates that the State
invoked this per se rule in its response to J.A.G.’s motion before the trial
court denied the motion.  The trial court therefore did not err in excluding
the polygraph results.  

D.              
Prosecutorial
misconduct claim

Next, J.A.G. contends
that the trial court abused his constitutional right to due process by failing
to consider his motions to dismiss and for sanctions based on allegations of
prosecutorial misconduct during the grand jury proceedings, but failed to secure
a ruling or refusal to rule from the trial court on them.  When a party does not obtain a ruling on a motion, request
that the court document its refusal to rule, or otherwise object to the court’s
refusal, that party may not later complain about the lack of any such
ruling.  See Tex. R.
App. P. 33.1(a); see Retzlaff v. Tex. Dep’t of Crim. Justice, 135 S.W.3d 731, 745 (Tex. App.—Houston [1st Dist.] 2003,
no pet.); see also Martin v. Commercial Metals Co., 138 S.W.3d 619, 623
(Tex. App.—Dallas 2004, no pet.) (motion for sanction); Jones v. Smith,
157 S.W.3d 517, 523–24 (Tex. App.—Texarkana 2005, pet. denied) (motions for
summary judgment and sanction).  J.A.G. waived this claim.  We
therefore overrule this issue.

E.      Admission of
psychologist’s report

 

J.A.G. further asserts that the trial
court erred in admitting the psychological report and testimony by Dr. Kevin
Schloneger during the disposition hearing.  Dr. Schloneger, whom the trial
court had ordered to conduct a psychosexual evaluation of J.A.G., prepared a
psychological evaluation rather than a psychosexual evaluation. J.A.G.
complains that Dr. Schloneger was not qualified to issue the report, and that
the report should not have been admitted because it was not the evaluation
ordered and contained numerous grammatical errors and unverified assertions of
fact.  

The Texas Family Code authorizes the
juvenile court to consider reports from probation officers, court employees,
and professional consultants, as well as lay witness testimony, at the
disposition stage.   Tex. Fam. Code Ann.
§ 54.04 (Vernon Supp. 2006).  Dr. Schloneger holds a Ph.D. in clinical
psychology and has a general clinical practice, including psychological
testing, family therapy, adolescent treatment and treatment of young children. 
In his clinical practice, Dr. Schloneger spends approximately forty percent of
his time treating juveniles.  He is also a licensed sex offender treatment
provider with the State of Texas.  We find no merit in J.A.G.’s assertion Dr.
Schloneger lacked the credentials and experience to issue a report in keeping
with section 54.04.

J.A.G.’s criticism of Dr.
Schloneger’s reliance on unverified assertions of fact is likewise without
merit.  As the Supreme Court has observed,

expert witnesses may testify about facts or data not personally perceived
but “reviewed by, or made known” to them. If the facts or data are of a type
upon which experts in the field reasonably rely in forming opinions on the
subject, the facts or data need not even be admissible in evidence. Thus, in
many instances, experts may rely on inadmissible hearsay, privileged
communications, and other information that the ordinary witness may not.

In re Christus
Spohn Hosp. Kleberg, 222 S.W.3d 434, 440 (Tex. 2007) (quoting Tex. R. Evid. 703).   The medical, school, and other
institutional records provided by the District Attorney’s office to Dr.
Schloneger for his review fall within the realm of data reasonably relied on by
experts in the field.

          Although Dr. Schloneger did
not study J.A.G.’s psychosexual history in depth, he did consider J.A.G.’s
sexual history predating the incident and did not find that it indicated he had
any specific propensity toward becoming a repeat sexual offender.  Rather, Dr.
Schloneger was more concerned with J.A.G.’s propensity for aggression toward
society in general.  In determining the appropriate disposition, the trial
court had the opportunity to weigh the fact that Dr. Schloneger provided a
psychological, rather than a psychosexual, evaluation along with the
grammatical errors and alleged misstatements in the evaluation brought out by
counsel on cross-examination.  We conclude that the trial court acted within
its discretion in considering Dr. Schloneger’s testimony and report.

F.      Ineffective
assistance of counsel claim

 

          J.A.G. contends that his
trial counsel provided constitutionally ineffective assistance, pointing to
counsel’s (1) failure to resubmit a proposed order to the court for mental
examination of A.K.D., which the court probably would have signed; (2) failure
to object to the hearsay testimony of A.K.D.’s teacher and the emergency room
nurse; (4) questioning of A.K.D. which elicited proof of an element necessary
to the State’s case; (4) failure to accept the trial court’s offer to recess
the proceedings to allow for preparation of a psychosexual report in compliance
with its section 54.04 order.   

We use the
same analysis for ineffective assistance of counsel claims in juvenile
proceedings that we do in criminal proceedings.  See In re R.D.B., 102 S.W.3d
798, 800 (Tex. App.—Fort Worth 2003, no pet.); In re E.J.L.,
01-02-00472-CV, 2003 WL 1995454, *7
(Tex. App.—Houston [1st Dist.] May 1, 2003, pet. denied) (mem. op.). 
To prevail on a claim of ineffective assistance of counsel, the defendant must
show that (1) his counsel’s performance was deficient and (2) a reasonable probability
exists that the result of the proceeding would have been different.  Strickland
v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The first
prong of Strickland requires the defendant to show that counsel’s
performance fell below an objective standard of reasonableness.  Thompson v.
State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Thus, the defendant must
prove objectively, by a preponderance of the evidence, that his counsel’s
representation fell below professional standards.  Mitchell v. State, 68
S.W.3d 640, 642 (Tex. Crim. App. 2002).  The second prong requires the
defendant to show a reasonable probability that, but for counsel’s
unprofessional errors, the result of the proceeding would have been different. See
Strickland, 466 U.S. at 693–94, 109 S. Ct. at 2067; see also Thompson, 9 S.W.3d at 812. A reviewing court should indulge a
strong presumption that counsel’s conduct falls within the wide range of
reasonable professional assistance; that is, the defendant must also overcome
the presumption that, under the circumstances, the challenged action “might be
considered sound trial strategy.” Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. “Any allegation of ineffectiveness must be firmly founded in the
record, and the record must affirmatively demonstrate the alleged ineffectiveness.”
Thompson, 9 S.W.3d at 813 (citing McFarland v. State, 928 S.W.2d 482,
500 (Tex. Crim. App. 1996)). Under normal circumstances, the record on direct
appeal will not be sufficient to show that counsel’s representation was so
deficient and lacking in tactical or strategic decision making as to overcome
the presumption that counsel’s conduct was reasonable and professional.  Bone
v. State, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

The record in
this case does not show any conduct outside the wide range of reasonable
professional assistance, and none of counsel’s alleged errors, if corrected,
would have probably resulted in a different outcome.  The testimony appellate
counsel identifies as objectionable goes only to whether A.K.D actually
consented to the contact and does not undermine the legally and factually
sufficient evidence supporting a finding that A.K.D. could not effectively
consent to it.  The record also contains other evidence that would support the
trial court’s finding even if the evidentiary errors asserted by J.A.G. had not
occurred.  We also must presume that counsel had tactical reasons for deciding
not to request a mental examination of A.K.D. or a psychosexual evaluation of
J.A.G.  For these reasons, we overrule this issue as well.

Conclusion

 

          We conclude that legally
and factually sufficient evidence supports the adjudication of delinquency;
J.A.G. waived his prosecutorial misconduct claim; the trial court did not err
in declining to consider the results of J.A.G.’s polygraph testing or in
considering the psychological report and testimony from Dr. Schloneger; and the
record does not reveal that J.A.G. received ineffective assistance of counsel. 
Accordingly, we affirm the adjudication and disposition of the trial court.

 

 

Jane Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Alcala and Bland.

 

 

 









[1] The emergency physician’s record also notes that the examination of
A.K.D. was limited by her mental retardation.  





[2]
J.A.G. also suggests that the admission by
A.K.D.’s parents that they kept pornographic material in the home weighs
against the trial court’s finding, but nothing in the record supports a
reasonable inference that A.K.D. had seen the materials or, if she had, that
she understood what they depicted.